**Veronica DEBERRY, as mother and next friend of Shauntia Marae Deberry, Plaintiffs,**

v.

**SHERMAN HOSPITAL ASSOCIATION, an Illinois corporation, Defendant.**

**No. 90 C 1173.**

United States District Court, N.D. Illinois, E.D.

June 15, 1990.

Kenneth C. Chessick, Stephen F. Gray, John W. Fisk, Law Office of Kenneth C. Chessnick, Schaumburg, Ill., for plaintiffs.

John G. Langhenry, Jr., Robert H. Smith, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

KOCORAS, District Judge:

This matter is before the court on Defendant Sherman Hospital Association's motion to dismiss Count I of Plaintiff Veronica Deberry's two-count complaint as failing to state a claim upon which relief can be granted. As Count II of the complaint is in this court solely on the basis of pendent jurisdiction, the defendant also asks that we dismiss it without prejudice so that the plaintiff can refile this single state-law claim in state court. For the following reasons, the defendant's motion is denied.

## BACKGROUND

At the heart of this case lies an alleged medical misdiagnosis of tragic proportions. The complaint, which we take as true for purposes of this motion to dismiss, states that on January 10, 1988, the plaintiff took her daughter, Shauntia Deberry, into Defendant Sherman Hospital's emergency room with a fever, rash, stiff neck with her head tilted to the left, and dispositional aberrations including irritability and lethargy. Plaintiff asserts that although her daughter received treatment at Sherman, she was discharged without her condition having been stabilized. Two days later, when her condition had not only failed to improve but had worsened, the plaintiff's daughter was finally admitted to Sherman where she was ultimately diagnosed as suffering from spinal meningitis. As a result of the disease, she, in addition to other sufferings, is now deaf.

Plaintiff has responded with the instant lawsuit. It consists of two counts. In Count I, the plaintiff claims that by discharging Shauntia without stabilizing her condition, Sherman violated the federal Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd (1988). Section 1395dd is also, and more commonly, referred to as "COBRA", the acronym for the Consolidated Omnibus Budget Reconciliation Act of 1986 of which § 1395dd is one small part.[1] Count II, on the other hand, is a straightforward state law medical malpractice claim brought pursuant to this court's pendent jurisdiction. It asserts that Sherman's agent, Dr. Douglas Jackson, was negligent in failing to suspect meningitis under the circumstances and in failing to run a blood test or spinal tap which would have detected the disease on January 10th.

Sherman has now moved to dismiss Count I pursuant to Federal Rule of Civil Procedure 12(b)(6) as failing to state a claim upon which relief can be granted. Sherman takes the position that Count I states nothing more than a state malpractice claim of misdiagnosis and thus cannot violate COBRA, which is concerned with prohibiting the refusal by hospitals to treat indigent patients with medical emergencies. Of course if Count I is dismissed, the foundation for federal jurisdiction over Count II evaporates; so Sherman also asks that we dismiss Count II as well so that the plaintiff may bring her suit in the appropriate forum: the Circuit Court of Cook County, Illinois.

## DISCUSSION

In order to have a claim dismissed under Rule 12(b)(6), the moving party must meet a high standard. The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits of the case. Under the "simplified notice pleading" of the Federal Rules of Civil Procedure, the allegations of a complaint should be construed liberally and "the complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that

---

1. Under the guise of "COBRA", § 1395dd has proved to be a boon for catchy law review titles. See, e.g., Kreiser, *COBRA: Straightening Out the Serpentine Law Regarding "Patient Dumping"*, 14 Minn.T.Law. 10 (Winter 1989); Note, *Preventing Patient Dumping: Sharpening the COBRA's Fangs*, 61 N.Y.U.L.Rev. 1186 (1986).

the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Hishon v. King & Spaulding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). Generally, "mere vagueness or lack of detail does not constitute sufficient grounds for a motion to dismiss." *Strauss v. City of Chicago*, 760 F.2d 765 (7th Cir. 1985).

When considering a defendant's motion to dismiss the Court must view the complaint's allegations in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Conley*, 355 U.S. at 45, 78 S.Ct. at 101. All well-pleaded facts and allegations in the plaintiff's complaint must be taken as true, *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 733 (7th Cir.1986), and the plaintiff is entitled to all reasonable inferences that can be drawn therefrom. "Furthermore, a complaint is not required to allege all, or any, of the facts logically entailed by the claim.... [A] complaint does not fail to state a claim merely because it does not set forth a complete and convincing picture of the alleged wrongdoing." *American Nurses Ass'n v. State of Illinois*, 783 F.2d 716, 727 (7th Cir.1986).

Since Count I asserts a statutory cause of action, we begin with the statute in question: 42 U.S.C. § 1395dd. The text of § 1395dd becomes all the more important because of the very few cases which addressed it, none of which has come from the Seventh Circuit Court of Appeals. Section 1395dd, as modified in 1986 by the Emergency Treatment and Active Labor Act, Pub.L. 99–272, 100 Stat. 82 (1986), was enacted to alleviate the problem of "patient dumping." This term refers to a hospital's refusal to treat an emergency patient, even though the hospital is physically capable of doing so, simply because the patient may be unable to pay. Congress' response to this perceived problem, § 1395dd, states, in relevant part, as follows:

**(a) Medical screening requirement**

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department to determine whether or not an emergency medical condition ... exists....

**(b) Necessary stabilizing treatment for emergency medical conditions ...**

**(1) In general**

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition ..., the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition ..., or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

Subsection (e) of § 1395dd then goes on to define some key terms, three of which are relevant here:

(1) The term "emergency medical condition" means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(A) placing the patient's health in serious jeopardy,

(B) serious impairment to bodily functions, or

(C) serious dysfunction of any bodily organ or part.

(4) (A) The term "to stabilize" means, with respect to an emergency medical condition, to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deteriora-

tion of the condition is likely to result from the transfer of the individual from a facility.

(5) The term "transfer" means the movement (including the discharge) of a patient outside the hospital's facilities at the direction of any person employed by ... the hospital....

■ Basic textual analysis of these provisions yields two primary ways in which a hospital can violate § 1395dd through the operation of its emergency room. But a prerequisite to both is that the patient in question must have had an emergency medical condition. Once it is established that the plaintiff showed up at the hospital's emergency room with an emergency medical condition, the hospital can violate § 1395dd either (1) by failing to detect the nature of the emergency condition through inadequate screening procedures under subsection (a), or, (2) under subsection (b), if the emergency nature of the patient's condition is detected, by failing to stabilize the condition before releasing the plaintiff. Whether either of these failures has occurred is essentially a fact-based reasonableness inquiry. This straightforward exegesis of § 1395dd's language is supported by two of four cases which have addressed the elements of a cause of action under the statute. See *Thornton v. Southwest Detroit Hosp.*, 895 F.2d 1131, 1133–35 (6th Cir.1990); *Thompson v. St. Anne's Hosp.*, 716 F.Supp. 8, 9–10 (N.D.Ill.1989) (Bua, J.).

■ Fashioning these elements into a pleading standard poses no grave difficulty, although it is something which no court has to date addressed. Combining the legal elements with the liberal federal rule of notice pleading, we conclude that the would-be COBRA plaintiff must allege that he (1) went to the defendant's emergency room (2) with an emergency medical condition, and that the hospital either (3) did not adequately screen him to determine whether he had such a condition, or (4) discharged or transferred him before the emergency condition had been stabilized.

■ Plaintiff Deberry has met this standard. First, she claims she brought her daughter to Sherman's emergency room and requested emergency medical care on her daughter's behalf. Second, she claims that her daughter had an emergency medical condition—there is no question that spinal meningitis would, in the words of subsection (e)(1)(A), "plac[e] the patient's health in serious jeopardy." Moreover, the plaintiff asserts facts supporting the existence of her daughter's condition in the form of symptoms such as fever, rash, a stiff neck with her head tilted to the left, and dispositional aberrations including irritability and lethargy. Third, the plaintiff alleges that she was discharged from the emergency room without her condition having been stabilized. As stated above, the definition of "to stabilize" asks whether the medical treatment and release was reasonable under the circumstances. This is obviously a factual inquiry which may not be decided on a motion to dismiss. While Sherman complains of conclusoriness in the plaintiff's allegations, this is not a fraud claim requiring particularized allegations and Sherman has not demonstrated in any way why it should be treated like one. The basic facts have been alleged and this is sufficient for purposes of Rule 8(a).

Notwithstanding § 1395dd's plain language, Sherman argues that, in order to state a cause of action under § 1395dd, a plaintiff must allege facts which support the conclusion that he was "dumped" (in Sherman's view this means refused any treatment at all) from a hospital emergency room based upon his inability to pay. In support of its view, Sherman cites the fact that such dumping of indigent patients was the impetus behind enactment of § 1395dd, as well as two recent federal district court decisions from other districts. Sherman warns that, "[t]aken to its logical conclusion, the plaintiff would be advocating that every Emergency Room case becomes a Federal issue, whether it is a missed fracture, a missed infection, a missed cardiac condition, or virtually any illness or disease process, since by definition, they are all potentially serious." Sherman's Memorandum in Support, at 4. Since Plaintiff Deberry has alleged no such facts and has in fact admitted to her daughter's having re-

ceived at least *some* treatment, Count I would fail under Sherman's proposed interpretation of § 1395dd.

We, however, find no reason to depart from the plain meaning of the statute as enacted. First, while the legislative history of § 1395dd indicates that perhaps the principal reason for its enactment was the refusal to treat indigents by certain hospitals, *see Stewart v. Myrick,* 731 F.Supp. 433, 435–36 (D.Kan.1990) (quoting legislative history at length), the language of the statute quite plainly goes further. Thus, it nowhere mentions either indigency, an inability to pay, or the hospital's motive as a prerequisite to statutory coverage. Nor does § 1395dd only apply to outright refusals to treat. For example, if the treatment provided leads to the discharge of an unstabilized patient, i.e., that it is reasonably likely that the patient will suffer material deterioration of his condition, the hospital clearly violates subsection (b) of the statute. Obviously we will not allow a few references to the statute's purpose in the legislative history to override the plain meaning of its terms as enacted. Inquiries into such peripheral matters as policy and legislative intent are relevant only "when ... a statute has an hiatus that must be filled or there are ambiguities in the legislative language that must be resolved." *Unexcelled Chemical Corp. v. United States,* 345 U.S. 59, 64, 73 S.Ct. 580, 97 L.Ed. 821 (1953); *see also Stewart v. Abend,* —— U.S. ——, 110 S.Ct. 1750, 1766–68, 109 L.Ed.2d 184 (1990) (chastising dissent for attempting "to undercut the plain meaning of [a statutory provision] by looking to its legislative history").

Second, although the district court decisions cited by Sherman *do* support its interpretation,[2] we find the analyses of those cases to be unpersuasive and decline to follow them. The most detailed of the two is Judge Dillin's opinion in *Evitt v. University Heights Hospital,* 727 F.Supp. 495 (S.D.Ind.1989). Indeed, only *Evitt* need be discussed here because the other, and more

recent, decision is based on the very same analysis as *Evitt* and, in fact, cites *Evitt* with approval. *See Stewart v. Myrick, supra,* 731 F.Supp. 433 (D.Kan.1990). Thus, our critique of *Evitt* applies equally well to *Stewart.*

In *Evitt,* the court was faced with an assertion of misdiagnosis that is analogous to the case at bar. The plaintiff had come to the defendant's emergency room complaining of chest pain. She was examined, diagnosed as having an inflamed chest wall, and discharged with instructions to take an anti-inflammatory drug, apply warmth to her chest, and call her private physician the following morning. It was later determined, however, that what the examining doctor took to be mere muscle inflammation had actually been a full-blown heart attack. The plaintiff argued that the hospital had erroneously determined that her condition was not serious through an inadequate screening procedure, thereby violating § 1395dd(a).

The *Evitt* court, however, granted the defendant's motion for summary judgment, concluding that "[t]he plaintiff's interpretation reaches beyond the purpose of the statute, which is specifically directed toward preventing prospective patients from being turned away for economic reasons." 727 F.Supp. at 497. The court held that, to avoid summary judgment under § 1395dd, a plaintiff must be able to "present evidence which could prove [he] was turned away from the Hospital for economic reasons...." *Id.* at 498. But unlike our interpretation, the *Evitt* court's narrow interpretation of § 1395dd was not based on any textual exegesis; the text of the statute was never even referred to. Instead, the decision rests on two grounds, neither of which is viable on closer scrutiny.

The first ground relied on by the *Evitt* court—the statute's purpose as expressed through its legislative history—we have already discussed and rejected. Since the language of the statute clearly goes be-

---

**2.** Actually, the decisions, even if we were to adopt their conclusions for purposes of the statute's scope of coverage, are not as supportive of Sherman's position as it might seem. Both

cases involved summary judgment motions rather than Rule 12(b)(6) motions to dismiss for failing to state a cause of action.

yond merely prohibiting a hospital from turning away an indigent at the emergency room door, we are not free to change that language through a clandestine use of the legislative history.

The second ground given by the *Evitt* court was that § 1395dd had to be construed narrowly because of its strong preemptive power. The court began from the premise that any conduct covered by § 1395dd would remove through federal preemption the regulation of that same conduct by state malpractice law. Thus, the court wrote: "To adjudicate these issues under the anti-dumping provision would lead to federal preemption not contemplated by this Act." *Id.* at 497. Simply put, the court assumed that double coverage was prohibited. From this premise, the court concluded that since Congress could not have intended to preempt a large body of state malpractice law (malpractice law being part of the health and safety matters which have traditionally been thought to be the peculiar province of the states), the coverage of § 1395dd must be confined to the narrowest possible limits.

The problem with this analysis, however, is that the preemptive power of § 1395dd is not what the *Evitt* court says it is. Indeed, it is quite the opposite. The court's conclusion that coverage by § 1395dd will automatically preempt dual coverage by state law assumes that Congress, in enacting the statute, intended to preempt the field. Field preemption simply means that Congress intended not only to regulate whatever is covered by the federal law at issue but to regulate it to the *exclusion* of the states. Field preemption, however, is never presumed; in fact, it is disfavored and must be clearly manifested by the statute in question, either through express language or its scheme, in order to exist.

Here, § 1395dd not only fails to provide for field preemption, it explicitly negates it. Subsection (f) of § 1395dd defines its preemptive effect, stating quite clearly that "[t]he provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement

of this section." Far from field preemption then, Congress merely intended to provide for conflict preemption. But this is nothing more than would have been mandated by the supremacy clause of Article VI had the statute been silent with respect to preemption. Contrary to the *Evitt* court's initial premise, it is well-established that conflict preemption does not forbid double regulation; it only preempts those state laws where "compliance with both federal and state regulations is a physical impossibility," or which pose "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See, e.g., California Federal Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987) (discussing the preemptive effect of Title VII). Under this preemption standard, it is apparent that state laws which punish the same conduct as § 1395dd, whether malpractice torts or otherwise, are perfectly appropriate. Thus, a broad interpretation of § 1395dd—an interpretation which we have already concluded is mandated by the express language of the statute—will not result in the wholesale preemption of state malpractice law as predicted by the *Evitt* court. It simply means that more conduct will be proscribed by both federal and state law.

The above discussion makes clear that neither of the grounds supporting the conclusions reached in *Evitt* and *Stewart* is viable. Therefore, those cases provide no justification whatsoever for departing from what we have determined to be the plain meaning of § 1395dd and we decline to follow them. While one may disagree with the efficacy of § 1395dd's breadth or its necessity, it is not this court's place to rewrite the language enacted by our duly elected officials. If Congress went too far in § 1395dd, then the statute must either be attacked constitutionally, if that is feasible, or through the same political processes which caused its enactment. Amendment by the judiciary, however, is never proper.

For the foregoing reasons, Sherman's motion to dismiss Count I is denied. Moreover, since there is still a federal question in the case, pendent jurisdiction of Count II

remains appropriate and will also not be dismissed.