## TAJA SMITH, AN INFANT, ETC., ET AL.

### V.

## RICHMOND MEMORIAL HOSPITAL

Record No. 910585

April 17, 1992

Present: Carrico, C.J., Compton, Stephenson, Whiting, Lacy, and Keenan, JJ., and Cochran, Retired Justice

*Edward W. Taylor (Taylor & Schockemoehl,* on briefs), for appellants.

*Judith B. Henry (Crews & Hancock,* on brief), for appellee.

JUSTICE LACY delivered the opinion of the Court.

In this case we consider whether the trial court properly sustained a demurrer without leave to amend on the ground that the motion for judgment failed to state a cause of action under the Emergency Medical Treatment and Women in Active Labor provisions of the Consolidated Omnibus Budget Reconciliation Act (COBRA or the Act), 42 U.S.C. § 1395dd (1988).

The circumstances of this case involve the medical treatment of a pregnant woman who subsequently gave birth to a child. We recite the facts as set out in the pleadings, taken as true for the purposes of reviewing the trial court's action on the demurrer. *Bowman v. State Bank of Keysville,* 229 Va. 534, 536, 331 S.E.2d 797, 798 (1985).

Connie Elizabeth Smith was admitted to Richmond Memorial Hospital (the Hospital) as a patient on July 18, 1988. Ms. Smith was approximately 33 weeks pregnant and had premature rupture of the uterine membranes. Ms. Smith remained at the Hospital until July 23, 1988.

During the afternoon of July 22, 1988, Ms. Smith complained of abdominal cramping and vaginal leakage. The discharge had turned to a greenish yellow color. In the afternoon and again at 10:00 p.m. she was given Nembutal, a hypnotic drug. By 10:00 p.m., Ms. Smith was complaining of irregular abdominal pain and contractions. By 10:30 p.m., her contractions were timed at five minute intervals. At 11:45 p.m., she was taken to the labor and delivery facilities of the Hospital. The vaginal discharge was now dark green in color. By midnight, the opening to the patient's uterus had dilated one centimeter, she had cold chills, and her temperature had dropped to 95.3 degrees Fahrenheit.

At 1:00 a.m., the Hospital called a physician, who ordered that Ms. Smith be transferred to the Medical College of Virginia Hospital (MCV). The physician was not Ms. Smith's regular attending physician, and he gave the verbal transfer order without examining her. Following the transfer order, a nurse began trying to locate an ambulance service to transfer Ms. Smith to MCV. Two services refused, and one was not obtained until the Richmond Memorial administrator agreed that the cost of the transfer could be billed to MCV. Connie Smith was taken from the Hospital at 2:10 a.m. and was admitted to MCV at approximately 2:30 a.m. on July 23, 1988.

A medical resident at MCV assessed Ms. Smith's condition to be "(1) prolonged premature rupture of the membranes, (2) preterm labor at 34 weeks, (3) the Chorioamnionitis should be ruled out, and (4) that there was questionable meconium discharge." At 3:00 a.m., Ms. Smith signed a consent for a caesarean delivery, if necessary. Her contractions were one to five minutes apart at 4:20 a.m. She was taken "emergently" to the delivery room where the child, Taja Smith, was delivered by caesarean operation at approximately 9:48 a.m. Both mother and child suffered substantial injuries. Taja has cerebral palsy and is severely brain damaged.

Ms. Smith sued Richmond Memorial Hospital in her individual capacity and on behalf of her daughter Taja (collectively Smith), claiming a violation of COBRA and seeking damages. The Hospital demurred on three grounds: (1) the claims are "actually those alleging medical malpractice" and, therefore, the circumstances alleged cannot support a claim against the Hospital under COBRA; (2) no actionable claim under COBRA was stated because Smith did not allege that indigency was the motivating reason for the transfer from Richmond Memorial Hospital to MCV; and (3) no notice of claim as required by Code § 8.01-581.2 was given.

The trial court first determined that Code § 8.01-581.2 notice of claim provisions were inapplicable to claims based on a COBRA violation. Next, stating that the "crux of the issue presented by plaintiff is that she remained at Richmond Memorial without adequate care," the trial court held that COBRA does not cover "emergency conditions arising from medical neglect during a stay in a hospital." Accordingly, the trial court agreed with the Hospital's argument that Smith's claim was actually one for medical malpractice and held that a cause of action under COBRA

was not sufficiently plead. The trial court sustained the demurrer without leave to amend.

We awarded Smith an appeal. We also granted a review of the Hospital's assignment of cross-error regarding the applicability of the notice of claim provisions of Code § 8.01-581.2 to claims filed under COBRA.[1]

### I.

■ Congress enacted COBRA in 1986 in response to the growing number of instances in which hospitals were refusing to treat individuals with emergency medical conditions, a practice generally referred to as "patient dumping." Under the common law, private hospitals have no duty to accept or to provide treatment for patients. While private hospitals traditionally did treat people in emergency situations, they generally were not fully compensated, or were not compensated at all, for treatment of indigent patients. With growing competition among hospitals, shifting this cost to paying patients became more difficult. As the hospitals' economic losses increased, the instances of patient dumping also increased. To counteract patient dumping and the resultant hardship and injury, COBRA established specific standards for the evaluation, treatment, and transfer of patients. *Abercrombie v. Osteopathic Hosp. Founders Ass'n*, 950 F.2d 676, 680 (10th Cir. 1991); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1039 (D.C. Cir. 1991); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268 (6th Cir. 1990); Andrew Jay McClurg, *Your Money or Your Life: Interpreting the Federal Act Against Patient Dumping*, 24 Wake Forest L. Rev. 173, 197-99 (1989); Karen I. Treiger, Note, *Preventing Patient Dumping: Sharpening the Cobra's Fangs*, 61 N.Y.U. L. Rev. 1186, 1187-88 (1986).

### II.

The Hospital argues that Smith did not plead a claim under COBRA for two reasons. First, asserting that coming to an emergency room in an emergency medical condition or in active labor is a prerequisite to the application of the treatment and transfer

---

[1] Although the Hospital argues on brief that an allegation of economic motivation for the transfer was an essential pleading requirement in this case, the trial court did not rule on this argument, and that issue is not before us.

provisions of subsections (b) and (c) of the Act, the Hospital argues that Smith's claim fails because she did not plead that she came to the emergency room in such a condition. Furthermore, the Hospital asserts that Smith's admission that her condition had been stabilized prior to the events giving rise to her transfer to MCV absolves the Hospital from liability under COBRA. Second, the Hospital argues that Smith's claim is one for misdiagnosis or improper treatment, and, therefore, that it is not cognizable under COBRA. In response, Smith contends that, under the Act's language, a patient need not be transferred from an emergency room to establish a COBRA cause of action, and that a hospital cannot escape COBRA liability by "initially stabilizing a patient, allowing the patient to again become unstable, and then transferring the patient."

Although framed in terms of the sufficiency of the pleading, the crux of the issue in this case is one of statutory interpretation: (1) whether COBRA's treatment and transfer requirements are limited solely to an emergency medical condition or active labor which has not been stabilized and which occurs in conjunction with initial admission to an emergency department; or (2) whether those requirements also apply when an emergency medical condition or active labor commences after the admission and initial stabilization of the patient's condition.

To resolve the parties' conflicting interpretations, we begin with an examination of the Act itself. At the time of the alleged violation, 42 U.S.C. § 1395dd stated in relevant part:

(a) **Medical screening requirement**

In the case of a hospital that has a hospital emergency department, *if any individual* (whether or not eligible for benefits under this subchapter) *comes to the emergency department* and a request is made . . . for examination or treatment . . . the hospital must provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists or to determine if the individual is in active labor . . . .

(b) **Necessary stabilizing treatment for emergency medical conditions and active labor**

(1) In general

*If any individual* (whether or not eligible for benefits under this subchapter) *comes to a hospital* and the hospital determines that the individual has an emergency medical condition or is in active labor, the hospital must provide either—

(A) . . . such further medical examination and such treatment as may be required to stabilize the medical condition or . . . provide for treatment of the labor, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

. . .

(c) **Restricting transfers until patient stabilized**

(1) Rule

*If a patient at a hospital* has an emergency medical condition which has not been stabilized . . . or is in active labor, the hospital may not transfer the patient unless—

(A)(i) the patient . . . requests that the transfer be effected, or

(ii) a physician . . . or other qualified medical personnel when a physician is not readily available in the emergency department, has signed a certification that . . . the medical benefits reasonably expected from the . . . [transfer] outweigh the increased risks to the individual's medical condition from effectuating the transfer . . . .

(Emphasis added.)

 The language used in each subsection describes distinct patient circumstances requiring different treatment protocols. If an individual *"comes to the emergency department,"* the hospital must provide an appropriate medical screening examination. *Id.* at § 1395dd(a). If an individual *"comes to a hospital"* and the hospital determines that an emergency medical condition or active labor exists, the hospital must stabilize the condition or transfer the person. *Id.* § 1395dd(b). If a *"patient at a hospital"* has an emergency condition or is in active labor, the hospital may transfer that patient only under certain conditions. *Id.* § 1395dd(c).

■ The statutory language clearly requires a patient to be in an emergency medical condition or to be in active labor before the provisions of subsections (b) and (c) apply. But we find nothing in the language of the Act which limits application of these subsections solely to a patient who initially arrives at the emergency room and who has not been stabilized, as the Hospital argues here. When the words of the statute are plain and unambiguous we need not resort to rules of statutory construction or legislative history. *Marsh* v. *City of Richmond*, 234 Va. 4, 11, 360 S.E.2d 163, 167 (1987).

■ This interpretation of the Act is consistent with the legislation's purpose. Patient dumping is not limited to a refusal to provide emergency room treatment. *See Thompson* v. *St. Anne's Hosp.*, 716 F.Supp. 8 (N.D. Ill. 1989). It occurs, and is equally reprehensible, at any time a hospital determines that a patient's condition may result in substantial medical costs and the hospital transfers the patient because it fears it will not be paid for those expenses. Dumping a patient in this manner is neither related to, nor dependent upon, the patient arriving through the emergency room and never being stabilized.

We are unaware of any case which has addressed this specific issue. The rationale of two cases considering the construction and purpose of the Act, however, is consistent with our interpretation of the statutory language. In *Thornton* v. *Southwest Detroit Hosp.*, 895 F.2d 1131 (6th Cir. 1990), a patient was taken to a hospital emergency room and then admitted to the intensive care unit where she was treated for ten days. She was later transferred to regular in-patient care where she was treated for another 11 days and was then discharged. After examining the use of the words "emergency room" and "hospital" in subsections (a), (b), and (c) of the Act, the court rejected the Hospital's argument that the Act's requirement of care for a patient did not extend beyond the emergency room to the intensive care and in-patient areas. The court reasoned that COBRA was intended to "insure that patients with medical emergencies would receive emergency care . . . [which] does not . . . stop when a patient is wheeled from the emergency room into the main hospital." *Id.* at 1135.

The rationale of *Thornton* was cited and utilized in *Loss* v. *Song*, No. 89C 6952, 1990 WL 159612 (N.D. Ill. 1990) (mem.). There, the hospital argued that a child with an emergency medical condition who was born at the hospital was precluded from

bringing an action under COBRA because the child could not plead that he was admitted to or through the emergency room. The *Loss* court allowed the child's case to proceed, holding that allegations that "from the moment he was born in the defendant hospital, [he] suffered from a severe congenital cardiac disease" were sufficient to state a claim under COBRA. *Id.* at *4. In both of these cases, the court examined the statutory language and found that it required the treatment of medical emergency conditions, irrespective of the manner in which the patient arrived at the institution or where within the hospital the treatment was provided.

The Hospital relies on specific language in three cases to support its argument that a plaintiff must allege arrival at an emergency room to state a cause of action under COBRA. The precedential value of those statements to this case is diminished, however, in light of the specific facts of the cases. In *Johnson* v. *University of Chicago Hosp.*, 774 F.Supp. 510 (N.D. Ill. 1991), the patient was never taken to the emergency room of the defendant hospital, nor was she ever even present in the hospital. The issue in *Deberry* v. *Sherman Hosp. Ass'n*, 741 F.Supp. 1302 (N.D. Ill. 1990), was whether stating a claim under COBRA required pleading that the hospital's failure to treat was based on the patient's inability to pay.[2] Statements regarding the need to plead an arrival or physical presence at an emergency room, unaccompanied by any issues or facts analogous or similar to those in the instant case, are neither determinative nor persuasive.

Finally, the Hospital cites the following passage from *Owens* v. *Nacogdoches County Hosp. Dist.*, 741 F.Supp. 1269 (E.D. Tex. 1990), as dispositive of the issue:

> To address these problems, 42 U.S.C. § 1395dd requires that any hospital with an emergency room must provide a medical screening examination to any patient who appears complaining of an emergency medical condition. It further provides that *such* patients cannot be transferred to another

---

[2] *Loss, supra,* and *Deberry* were both decided in the Federal District Court for the Northern District of Illinois. In *Loss,* the court acknowledged its prior statement in *Deberry* that a "would-be COBRA plaintiff" must plead presentation to the emergency room, but did not consider that statement as applying in all COBRA cases. *Loss,* 1990 WL 159612 at *3.

facility in an unstable condition, and requires that such a transfer be "appropriate."

(Emphasis added.) *Id.* at 1272. This passage appears in the court's general discussion of the Act entitled "I. Background-42 U.S.C. § 1395dd." It is neither the result of an analysis· of the specific provisions of the Act nor part of any holding made by the court in conjunction with the issues in the case. Reliance on a single word contained in an abstract discussion of the general nature is misplaced, and provides no support for the Hospital's position in this case.

Although the legislative history of COBRA indicates Congressional concern with denial of treatment and inappropriate transfers of indigent persons who come to the emergency rooms of hospitals, the plain language Congress chose does not limit the Act to those circumstances. Many courts called on to interpret the language of the Act have reached similar conclusions regarding the breadth of coverage the statutory language provides, in contrast to the more focused scope reflected in the legislative history of the Act. *See, e.g., Brooker v. Desert Hosp. Corp.*, 947 F.2d 412, 414-15 (9th Cir. 1991); *Gatewood*, 933 F.2d at 1040; *Lee by Wetzel v. Alleghany Regional Hosp. Corp.*, 778 F.Supp. 900, 902 (W.D. Va. 1991); *Delaney v. Cade*, 756 F.Supp. 1476, 1485-86 (D. Kan. 1991). As stated by the court in *Cleland v. Bronson Health Care Group, Inc.*:

> The words of the statute . . . are quite plain, and interpreting them as such does not lead to an absurd result. It leads to a result considerably broader than one might think Congress should have intended, or perhaps than any or all individual members of Congress were cognizant of. However, it is not our place to rewrite statutes to conform with our notions of efficacy or rationality. That is the job of Congress. . . . Here, the result we reach in no way vitiates or is contrary to Congress's indicated concern in passing the legislation. It may go further than what Congress contemplated, but that is not a reason to distort or excise the words that Congress wrote.

917 F.2d at 270.

■ We agree with this rationale, and it is equally applicable in this case. The words of the statute are plain, and our interpreta-

tion of those words does not subvert the purpose of the legislation or lead to an absurd result. Accordingly, we hold that the transfer provisions of § 1395dd(c) are applicable to situations in which a patient in a hospital has an emergency medical condition or is in active labor as defined by the Act.

■ Turning to the sufficiency of the pleadings, Smith alleged, *inter alia*, that just prior to transfer she was suffering from pains and abdominal cramping, had discolored vaginal discharge, experienced a temperature drop, and had frequent uterine contractions, and had begun to dilate. The pleadings also state that no certificate such as is required by § 1395dd (c)(1)(A)(ii) was executed in conjunction with Smith's transfer to MCV. These facts, along with the allegations that Smith was in active labor and had an emergency medical condition at the time of the transfer and that the Hospital did not comply with the requirements for transfer, are sufficient to state a claim under COBRA.[3]

### III.

Because the action of the trial court in sustaining the Hospital's demurrer will be reversed and the case remanded for the reasons stated above, we must consider the Hospital's assignment of cross-error. The Hospital asserts that the trial court erred in holding that the notice of claim provisions of Va. Code § 8.01-581.2 are inapplicable to claims under COBRA. We disagree with the Hospital.

Subsection (f) of COBRA provides that:

The provisions of this section do not preempt any state or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section.

---

[3] In light of this holding we do not address the Hospital's second argument, that the claim is actually one of misdiagnosis or improper treatment. The Hospital admits that a medical malpractice and COBRA claim can exist simultaneously and we have held that a COBRA claim has been plead. Whether the COBRA claim here is in reality only a traditional malpractice claim, as the Hospital argues, is an issue of fact, not pleading, and might be the subject of a motion for summary judgment as in *Stewart* v. *Myrick*, 731 F.Supp. 433 (D. Kan. 1990), and *Evitt* v. *University Heights Hosp.*, 727 F.Supp. 495 (S.D. Ind. 1989). *See also Anadumaka* v. *Edgewater Operating Co.*, No. 91 C 5374, 1992 WL 6726 (N.D. Ill. 1992); *Coleman* v. *McCurtain Memorial Medical Management, Inc.*, 771 F.Supp. 343 (E.D. Okla. 1991); *Lee*, 778 F.Supp. at 903. *Compare Deberry* v. *Sherman Hosp. Ass'n*, 741 F.Supp. 1302 (N.D. Ill. 1990) *with Deberry* v. *Sherman Hosp. Ass'n*, 769 F.Supp. 1030 (N.D. Ill. 1991).

The Hospital argues that the state notice of claim provisions do not conflict with COBRA. In support of this position, the Hospital cites *Draper* v. *Chiapuzio*, 755 F.Supp. 331, 333 (D. Or. 1991), which held that the Oregon requirement that notice of a wrongful death claim against a public body be filed within one year after the death did not conflict with COBRA. The Oregon statute, however, involved only a simple notice of claim, which is a significant distinction.[4]

■ The Virginia notice provisions not only require a plaintiff to provide written notice of the claim to the health care provider, they also absolutely prohibit the filing of a medical malpractice claim against the health care provider until 90 days after such notification and, if the health care provider chooses to have the issue reviewed by a malpractice review panel, the suit cannot be filed until the panel completes its review. Code § 8.01-581.2(A). The state statute of limitations is tolled during this period. It is this aspect of the notice of claim provision which is in direct conflict with the provisions of COBRA.

■ Subsection (d)(3)(C) of COBRA establishes a two-year statute of limitations for the filing of claims under the Act. COBRA establishes a separate federal cause of action, cognizable in federal and state courts, independent of any additional or pendant state claims. *Sorrells* v. *Babcock*, 733 F.Supp. 1189 (N.D. Ill. 1990); *Reid* v. *Indianapolis Osteopathic Medical Hosp. Inc.*, 709 F.Supp. 853 (S.D. Ind. 1989); *Bryant* v. *Riddle Memorial Hospital*, 689 F.Supp. 490 (E.D. Penn. 1988). The tolling provisions of the state statute cannot act to toll the running of the statute of limitations established in federal legislation which created a federal right of action. *Burrows* v. *Turner Memorial Hosp., Inc.*, 762 F.Supp. 840, 843 (W.D. Ark. 1991).

■ Unlike the Oregon requirement, the Virginia notice of claim provision is not restricted to a mere notice. Compliance with the notice provisions of the Virginia statute could result in the inability of a litigant to file a claim within the COBRA two-year statute of limitations period. Consequently, we hold that the trial court correctly ruled that the notice of claim provisions of Code § 8.01-581.2 conflict with the requirements of COBRA and, therefore, are inapplicable to COBRA causes of action.

---

[4] We also note that the complaint in *Draper* was not limited to a cause of action under COBRA as was the complaint here, but also included a cause of action for common law negligence.

For the reasons discussed above, the judgment of the trial court will be affirmed in part and reversed in part, and the case remanded for further proceedings.

*Affirmed in part,*
*reversed in part,*
*and remanded.*