<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-1594

                   MAYDA LOPEZ-SOTO, ET AL.,

                    Plaintiffs, Appellants,

                               v.

                  JOSE HAWAYEK, M.D., ET AL.,

                     Defendants, Appellees.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

        [Hon. Salvador E. Casellas, U.S. District Judge]

                             Before

                     Selya, Circuit Judge,
                                
            Coffin and Cyr, Senior Circuit Judges.
                                
                                  
                                
    Guillermo Ramos Luia, with whom Harry Anduze Montao was on
brief, for appellants.
    Jos A. Rivera Cordero, with whom Pedro Lugo Frank, Luis F.
Montijo and Mirta Rodriguez Mora were on brief, for appellees.
     

April 9, 1999

 SELYA, Circuit Judge.  This appeal presents a fundamental
question  concerning the interpretation of the Emergency Medical
Treatment and Active Labor Act (EMTALA), 42 U.S.C.  1395dd (1994)
(amended 1997).  We neither minimize the difficulty of the question
nor pretend that the answer is transpiciously clear.  Upon careful
perscrutation, however, we hold that EMTALA subsections (a) and (b)
are to be read disjunctively, not conjunctively.  Accordingly, we
reverse the district court's contrary ruling and reinstate the
plaintiffs' action.
I.  BACKGROUND
 We rehearse only those facts necessary to add a modicum
of texture to our statutory analysis, accepting as true the
appellants' version of events.  See Fed. R. Civ. P. 56.  For ready
reference, we reproduce EMTALA's pertinent provisions in an
Appendix.
 Experiencing normal labor pains, Mayda Lpez-Soto arrived
at Auxilio Mutuo Hospital (the Hospital) in the early morning hours
of June 12, 1993.  Hospital personnel brought her to the maternity
ward where she was examined and admitted.  Dr. Jos Hawayek, an
obstetrician, broke her water at approximately 7:30 a.m., revealing
the presence of thick "pea soup" meconium in the amniotic fluid.  
Rupturing the membranes of the amniotic sac failed to stimulate
dilation, so Dr. Hawayek ordered a cesarean section.  Lpez-Soto
gave birth to a baby boy at 1:50 p.m. (roughly 15 minutes after the
operation commenced).  The infant emerged in severe respiratory
distress due to meconium aspiration.  His condition presented a
medical emergency.
 Hospital staffers summoned Dr. Martn Garrido, the
pediatrician on call.  Dr. Garrido determined that the baby
required specialized care and began making arrangements to transfer
him to a hospital with a functioning neonatal intensive care unit.  
Before transport occurred, Dr. Garrido identified an additional
cause for medical concern:  the presence of a pulmonary
pneumothorax.  He nonetheless elected to send the infant to the
receiving hospital without first attempting to stabilize the
patient or to treat that exigent condition.  The baby was admitted
to the San Juan Pediatric Hospital that evening, but perished the
next day.
 Lpez-Soto and her husband brought suit on behalf of
themselves and the deceased child in Puerto Rico's federal district
court.  The complaint named as defendants the Hospital and several
caregivers, including Drs. Hawayek and Garrido.  Lpez-Soto
premised jurisdiction on the presence of a federal question, see 28
U.S.C.  1331, that question being the existence of a putative
cause of action against the Hospital arising under federal law (to
wit, EMTALA).  She added supplemental claims for medical
malpractice under local law against all the defendants.
    Only the EMTALA claim is relevant here.  In her
complaint, Lpez-Soto posited that the Hospital violated EMTALA
because her baby was born "with a severe pulmonary condition that
required emergency and immediate medical care and treatment," but
the Hospital nonetheless transferred him to another  institution
without stabilizing this condition.  The defendants denied the
material allegations of the complaint and contested jurisdiction,
saying that EMTALA did not apply.  After considerable jousting (not
relevant here), the district court, acting pursuant to Fed. R. Civ.
P. 56, accepted the defendants' jurisdictional argument and
dismissed the EMTALA claim.  At the same time, the court declined
to retain supplemental jurisdiction over the medical malpractice
claims, dismissing them without prejudice.  See 28 U.S.C.  
1367(c).  This appeal ensued.
II.  ANALYSIS
    Lpez-Soto's EMTALA claim hinges on the Hospital's
alleged failure to comply with the statute's stabilization and
transfer provisions.  See 42 U.S.C.  1395dd(b)-(c).  In a
thoughtful (though unpublished) opinion, the district court
concluded that Congress's isthmian concern with patient dumping   
the practice of refusing to accept or treat patients who are
uninsured or have no demonstrable means of payment   precluded
reading these provisions independently of 42 U.S.C.  1395dd(a).  
The court therefore adopted a conjunctive interpretation of all
three subsections and ruled that they create statutory duties for
a covered hospital solely with regard to persons who come to the
emergency department for assistance.  Only in that event must the
hospital  provide an appropriate medical screening, 42 U.S.C.  
1395dd(a); and, only if that screening uncovers an emergency
medical condition must the hospital stabilize the patient and
refrain from transferring him except in compliance with the
statutory commands, see 42 U.S.C.  1395dd(b)-(c).
    Superimposing this interpretation upon the scenario
depicted by Lpez-Soto, the district court reasoned that the
newborn had not come to the Hospital's emergency room seeking
treatment for his respiratory distress, but, rather, had come to
the Hospital via the operating room.  Consequently, the court
determined that EMTALA's stabilization and transfer obligations had
not been triggered and that Lpez-Soto had failed to state a
cognizable claim under federal law.
    We afford plenary review to the district court's
resolution of this unadulterated question of law.  See, e.g.,
United States v. Gifford, 17 F.3d 462, 472 (1st Cir. 1994).  We
start our search for the meaning of the words that Congress wrote
with an appraisal of the statutory text and structure, see Inmates
of Suffolk Country Jail v. Rouse, 129 F.3d 649, 653 (1st Cir.
1997), mindful that if the plain language of the statute points
unerringly in a single direction, an inquiring court ordinarily
should look no further.  See United States v. Charles George
Trucking Co., 823 F.2d 685, 688 (1st Cir. 1987).
    EMTALA has a long reach.  It touches all acute care
hospitals that have executed Medicare provider agreements with the
federal government pursuant to 42 U.S.C.  1395cc.  See 42 U.S.C.
1395dd(e)(2); see also Correa v. Hospital San Francisco, 69 F.3d
1184, 1189-90 (1st Cir. 1995).  Moreover, it imposes myriad duties
on these covered hospitals.
    For the most part, these duties reside in three principal
statutory silos.  The most familiar of these is subsection (a),
which imposes a duty to triage.  This duty takes the form of a  
requirement that a covered hospital perform an "appropriate medical
screening examination" on "any individual" who "comes to the
emergency department" seeking examination or treatment.  42 U.S.C.
1395dd(a).  Clearly, this provision obligates hospitals to screen
only those individuals who present themselves at the emergency
department.
    Subsection (b) has a different focus.  It emphasizes
stabilization, not screening.  Thus, if "any individual . . . comes
to a hospital and the hospital determines that the individual has
an emergency medical condition," the hospital must try to stabilize
that condition, and can shift the patient to another institution
only in accordance with EMTALA's transfer provisions.  42 U.S.C.  
1395dd(b).  This language unambiguously imposes certain duties on
covered hospitals vis--vis any victim of a detected medical
emergency, regardless of how that person enters the institution or
where within the walls he may be when the hospital identifies the
problem.  See Helton v. Phelps County Regional Med. Ctr., 794 F.
Supp. 332, 333 (E.D. Mo. 1992); Smith v. Richmond Mem'l Hosp., 243
Va. 445, 451-52, 416 S.E.2d 689, 692 (1992).  Nothing in the
subsection's text suggests a necessary relationship between a
hospital's obligations and the identity of the department within
the hospital to which the afflicted individual presents himself.
    Subsection (c) seemingly has relevance to both of the
preceding subsections.  It provides that "[i]f an individual at a
hospital has an emergency medical condition which has not been
stabilized . . ., the hospital may not transfer the individual"
save upon compliance with certain stipulated conditions.  42 U.S.C.
1395dd(c)(1).  This subsection does not distinguish between
patients whose conditions are diagnosed in the emergency room and
those whose conditions emerge in other hospital departments.
    We reject the district court's attempt to meld these
three duties together principally because doing so necessitates
eschewal of subsection (b)'s plain language   "comes to a hospital"
 in favor of a phrase   "comes to the emergency department"   that
appears only in subsection (a).  This compressed approach renders
the "comes to a hospital" language meaningless; after all, if
subsection (a)'s predicate requirement that an individual "come[]
to the emergency department" were understood to infiltrate
subsection (b), the latter's "comes to a hospital" requirement
would be altogether superfluous. It is a time-honored tenet that
"[a]ll words and provisions of statutes are intended to have
meaning and are to be given effect, and no construction should be
adopted which would render statutory words or phrases meaningless,
redundant, or superfluous."  United States v. Ven-Fuel, Inc., 758
F.2d 741, 751-52 (1st Cir. 1985).  We are reluctant to disregard
this venerable canon of construction, especially since a sensible,
available interpretation of the statute   one that places the three
subsections side by side, rather than in lockstep   gives effect to
both phrases.
    A further canon of construction has relevance here.  The
fact that Congress used the "comes to an emergency department"
language in subsection (a) while employing different phraseology
("comes to a hospital") in subsection (b) serves to emphasize the
separateness of the statutory commands.  "[I]t is generally
presumed that Congress acts intentionally and purposely when it
includes particular language in one section of a statute but omits
it in another."  BFP v. Resolution Trust Corp., 511 U.S. 531, 537
(1994) (citations and internal quotation marks omitted).  Courts
have an obligation to refrain from embellishing statutes by
inserting language that Congress opted to omit.  See Keene Corp. v.
United States, 508 U.S. 200, 208 (1993).  So it is here.  
Congress's decision to change the "emergency department" language
rather than to repeat it in subsection (b) is potent evidence that
Congress preferred to cast a wider net in respect to stabilization.
    Finally, a disjunctive approach draws strength from the
fact that subsection (b) mentions neither an emergency room locus
nor a medical screening as a precursor to a hospital's
stabilization obligations.  Rather, those obligations attach as
long as an individual enters any part of the hospital and the
hospital determines that an emergency medical condition exists.  
See 42 U.S.C.  1395d(b)(1).  As a practical matter, a hospital
more often than not will discover the existence of an emergency
medical condition by performing the screening required under
subsection (a)   but nothing in EMTALA's language or structure
makes subsection (b) an adjunct to subsection (a).  Moreover,
punctuation can provide valuable insights into statutory
interpretation, see United States v. Ron Pair Enters., Inc. 489
U.S. 235, 241-42 (1989), and we cannot overlook that Congress chose
structurally to disconnect the three subsections, closing them off
from each other by periods, without any conjunctive links.  A
statute should be parsed as punctuated unless some good reason
exists to read it otherwise.  See 2A Sutherland, Statutes and
Statutory Construction  47.15, at 179 (5th ed. 1992).
    We are not the only court to conclude that EMTALA
requires such a disjunctive reading.  In what appears to have been
the first case addressing the issue, the Virginia Supreme Court
found "nothing in the language of the Act which limits application
of [subsections (b) and (c)] solely to a patient who initially
arrives at the emergency room."  Smith, 243 Va. at 452, 416 S.E.2d
at 692.  Consequently, the court concluded that a plaintiff who had
not come to the defendant hospital's emergency room nonetheless
could sue under subsection (c) for an allegedly improper transfer.  
See id.; see also Reynolds v. Mercy Hosp., 861 F. Supp. 214, 222
(W.D.N.Y. 1994); Helton, 794 F. Supp. at 333.
    The Tenth Circuit also has accepted the disjunction
between subsections (a) and (b).  In Urban v. King, 43 F.3d 523
(10th Cir. 1994), a pregnant woman went to the hospital for a
stress test (not conducted in the emergency department).  Despite
warning signs, the hospital sent her home.  When she returned the
following day, the hospital belatedly determined that she had an
emergency condition and began efforts to stabilize her.  The woman
sued, claiming that the hospital violated EMTALA on the first dayby sending her home without stabilizing her emergency condition.  
Although the case was decided on a different ground, the court said
that subsection (a) was beside the point.  See id. at 525 n.2.  
This dictum can only mean that the court did not consider emergency
room arrival to be a prerequisite to liability under either
subsection (b) or (c).
    We find further support for our interpretation in Robertsv. Galen of Va., Inc., 119 S. Ct. 685 (1999).  In the underlying
opinion, the Sixth Circuit imported an intent requirement from
subsection (a) into subsection (b), and ruled that, in a subsection
(b) case, a plaintiff must show that the hospital acted with an
improper motive in failing to stabilize.  See Roberts v. Galen of
Va., Inc., 111 F.3d 405, 410 n.3, 411 (6th Cir. 1997); see also  
Cleland v. Bronson Health Care Group, Inc., 917 F.2d 266, 272 (6th
Cir. 1990) (holding that to prove  inappropriateness under
subsection (a), a plaintiff must show an improper motive
undergirding the hospital's actions).  The Supreme Court rejected
on textual grounds this attempt to transplant a standard from
subsection (a) into subsection (b).  See Roberts, 119 S. Ct. at
686.  Taking a similar textual approach, we find that subsection
(b), unlike subsection (a), contains no requirement of entry
through the portals of the emergency department.  Thus, by analogy
to Roberts, the plain language of the statute militates against
importation of the "emergency department" requirement from
subsection (a) into subsection (b).
    To these marshaled authorities, we add that a disjunctive
"plain language" reading of the statute works no fatuity.  
Subsection (a) requires hospitals to provide appropriate screening
for individuals who seek assistance at an emergency department of
a covered hospital, whereas subsection (b) serves a different
purpose   obligating hospitals to stabilize individuals (wherever
in the hospital they may be) when emergency medical conditions are
detected.  In short, these two provisions create distinct
obligations and apply to different classes of individuals.  SeeSmith, 243 Va. at 451, 416 S.E.2d at 692.  Moreover, it makes good
sense to restrict subsection (a) screenings to emergency room
arrivals, given the peculiar set of problems associated with
treatment in such facilities.  By contrast, the broader, hospital-
wide sweep of subsection (b) makes equally good sense.  While
screening is arguably the key to ensuring the health of itinerants
who arrive at an emergency room, stabilization is arguably the key
to ensuring the health of those already admitted to the hospital
who develop emergency medical conditions.
    To be sure, the proponents of a conjunctive reading
possess some ammunition   but, for the most part, they are shooting
blanks.  The appellees prominently mention several cases
interpreting subsection (c) to impose liability only upon a prior
subsection (b) determination that the transferee patient suffers
from an emergency medical condition.  See, e.g., Vickers v. Nash
Gen'l Hosp., Inc., 78 F.3d 139, 145 (4th Cir. 1996); Urban, 43 F.3d
at 525; Gatewood v. Washington Healthcare Corp., 933 F.2d 1037,
1041 (D.C. Cir. 1991).  We question the relevance of these
precedents.  The linkage of subsections (b) and (c) finds explicit
support in the text of subsection (b)(1), which ties the need for
stabilization of discerned emergency medical conditions to the
transfer restrictions imposed by subsection (c).  See 42 U.S.C.  
1395dd(b)(1)(B) (explaining that, if a hospital determines that an
emergency medical condition exists, it either must stabilize the
individual or transfer him "in accordance with subsection (c)").  
This furnishes a sound reason, embedded in the statute's text, to
read subsection (c)'s qualified prohibition on unstabilized
transfers in tandem with subsection (b)'s requirement that the
hospital actually detect the emergency medical condition.
    Although conjoining subsections (b) and (c) therefore
makes linguistic and structural sense, no similar justification
exists for marrying subsection (a) to subsection (b).  The mere
fact that two pieces of a statutory puzzle may be interdependent in
a particular way does not mean that all the pieces must fit
together in the same manner.  As we have said, the language and
structure of subsections (a) and (b) counsel in favor of a
disjunctive interpretation.  The district court's attempt to merge
these two provisions renders nugatory key language pertaining to
the scope of the statute.  We see no compelling reason to sacrifice
the statute's plain language on the altar of interdependence in
order artificially to interlock subsections (a) and (b).
    Even though the case law bundling subsections (b) and (c)
is off point, there are some other straws in the wind that blow in
the appellees' direction.  For example, in James v. Sunrise Hosp.,
86 F.3d 885 (9th Cir. 1996), a Ninth Circuit panel stated that
subsection (c)'s transfer restrictions "apply only when an
individual comes to the emergency room, and after an appropriate
screening examination, the hospital determines that the individual
has an emergency medical condition."  Id. at 889 (emphasis
supplied; internal quotation marks omitted).  In making this
statement, the James panel, like the court below, construed
subsections (a), (b), and (c) as relating to a single sequence of
events.  See id.  The court forged this link largely on the basis
of a phrase found in 42 U.S.C.  1395dd(c)(1)(A)(iii).  With
respect, we think that this cross-reference cannot carry the weight
that James placed upon it.
    Subsection (c) generally prohibits transfers of
unstabilized patients unless the patient has so requested in
writing, see id.  1395dd(c)(1)(A)(i), a physician has certified
that the medical benefits of an appropriate transfer outweigh the
attendant risks, see id.  1395dd(c)(1)(A)(ii), or, "if a physician
is not physically present in the emergency department at the time
an individual is transferred, a qualified medical person" has
signed the certificate after consulting with a physician who has
made the transfer decision and who subsequently countersigns, id. 1395dd(c)(1)(A)(iii).  James fastens onto this "not physically
present in the emergency department" language, overlooking that the
provision addresses only a discrete subset of transfer
circumstances   the physical inability of a physician to sign the
requisite certificate when time is of the essence    that Congress
likely associated with emergency room "on call" arrangements.  
Indeed, Congress's intention not to ensconce the certification
procedure within the exclusive domain of the emergency department
is made manifest by the language of 42 U.S.C.  
1395dd(c)(1)(A)(ii), which prescribes an independent procedure for
effecting unstabilized transfers without imposing any limitation on
where certification decisions must be made.  That same intent is
also evinced in 42 U.S.C.  1395dd(b)(1)(A), which directs use of
the staff and resources of the entire hospital facility to
stabilize a patient once an emergency medical condition
determination has been made.  Since the James court's reading of
the transfer restrictions flies in the teeth both of EMTALA's
physician-wide certification option and its hospital-wide
stabilization requirement, we decline to follow it.
    In settling upon a conjunctive reading of subsections (a)
and (b), the district court fretted most over legislative purpose.  
It cannot be gainsaid that, in enacting EMTALA, Congress was driven
by a concern that hospitals were refusing to admit and treat
uninsured patients. See H.R. Rep. No. 99-241(I), at 27 (1986),
reprinted in 1986 U.S.C.C.A.N. 579, 605; see also Correa,  69 F.3d
at 1189.  The lower court believed that allowing EMTALA's
stabilization and transfer obligations to apply outside the context
of emergency room arrivals would extend the statute's reach beyond
this particularized concern with patient dumping.  For three
reasons, we think that this is too cramped a view.
    In the first place, courts interpret statutes primarily
through detailed analysis of concrete statutory language, not by
reference to abstract notions of generalized legislative intent.  
See Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992)
(reiterating "that courts must presume that a legislature says in
a statute what it means and means in a statute what it says
there"); see also Correa, 69 F.3d at 1194 (concluding that,
notwithstanding Congress's focus on patient dumping, an
individual's financial status plays no part in determining the
reach of subsection (a)).  Put another way, although legislative
purpose can shed light upon congressional intent where Congress has
blown an uncertain trumpet, it cannot serve as the baseline for
statutory construction.
    In the second place, Congress obviously had a horizon
broader than the emergency room in mind when it enacted EMTALA.  
The statute explicitly embraces women in labor, see 42 U.S.C.  
1395dd(e)(1)(B) (defining emergency medical condition)   yet most
gravid women go to maternity wards, not emergency rooms, when they
are ready to give birth.
    Last, but surely not least, Congress's preoccupation with
patient dumping is served, not undermined, by forbidding the
dumping of any hospital patient with a known, unstabilized,
emergency condition.  After all, patient dumping is not a practice
that is limited to emergency rooms.  If a hospital determines that
a patient on a ward has developed an emergency medical condition,
it may fear that the costs of treatment will outstrip the patient's
resources, and seek to move the patient elsewhere.  That strain of
patient dumping is equally as pernicious as what occurs in
emergency departments, and we are unprepared to say that Congress
did not seek to curb it.  Accord Smith, 243 Va. at 452, 416 S.E.2d
at 692.
    The district court also worried that, without an
emergency room arrival limitation, EMTALA might be converted into
a federal cause of action for medical malpractice.  We agree that
Congress did not intend such a result, see Correa, 69 F.3d at 1192,
but we suspect that the district court's fears are overblown.  Cf.William Shakespeare, Macbeth, act 1, sc. 3 (1605) (warning that
present fears may be "less than horrible imaginings").  In all
events, the paradigmatic EMTALA circumstances of the instant case
give us no occasion to address such looming issues.  Here, the
newborn's emergency condition was apparent upon presentment and the
corresponding decision to transfer was made immediately.
III.  CONCLUSION
    We need go no further.  Because subsections (a) and (b)
of EMTALA operate disjunctively rather than conjunctively, the
infant decedent's arrival in the operating room and the Hospital's
prompt detection of an emergency medical condition, if proven, will
suffice to engage the gears of EMTALA's stabilization and transfer
obligations.  See 42 U.S.C.  1395dd(b).  It follows that the
district court erred in dismissing the complaint on jurisdictional
grounds.  Whether Lpez-Soto has made out the other elements of  an
EMTALA claim is, of course, a different question   and one that is
not now before us.  At this stage of the litigation we conclude
only that the absence of emergency room presentment does not
preclude prosecution of this suit under 42 U.S.C.  1395dd(b).
    In light of this conclusion, we reverse the district
court's dispositive order and remand for further proceedings.  The
district court must, inter alia, reinstate the pendent claims which
it previously dismissed.
Reversed and remanded.

                       STATUTORY APPENDIX
1395dd.  Examination and treatment for emergency medical
conditions and women in labor
    (a) Medical screening requirement
       In the case of a hospital that has a hospital
    emergency department, if any individual . . . comes to
    the emergency department and a request is made on the
    individual's behalf for examination or treatment for a
    medical condition, the hospital must provide for an
    appropriate medical screening examination within the
    capability of the hospital's emergency department,
    including ancillary services routinely available to the
    emergency department, to determine whether or not an
    emergency medical condition (within the meaning of
    subsection (e)(1) of this section) exists.
    (b) Necessary stabilizing treatment for emergency medical
    conditions and labor
         (1) In general
            If any individual . . . comes to a hospital
         and the hospital determines that the individual
         has an emergency medical condition, the hospital
         must provide either    
              (A) within the staff and facilities
              available at the hospital, for such further
              medical examination and such treatment as
              may be required to stabilize the medical
              condition, or
              (B) for transfer of the individual to
              another medical facility in accordance with
              subsection (c) of this section.
         . . .
    (c) Restricting transfers until individual stabilized
         (1) Rule
           If an individual at a hospital has an emergency
         medical condition which has not been stabilized
         (within the meaning of subsection (e)(3)(B) of
         this section), the hospital may not transfer the
         individual unless    
              (A)(i) the individual (or a legally
              responsible person acting on the
              individual's behalf) after being informed of
              the hospital's obligations under this
              section and of the risk of transfer, in
              writing requests transfer to another
              facility,
              (ii) a physician . . . has signed a
              certification that based upon the
              information available at the time of
              transfer, the medical benefits reasonably
              expected from the provision of appropriate
              medical treatment at another medical
              facility outweigh the increased risks to the
              individual and, in the case of labor, to the
              unborn child from effecting the transfer, or  
              (iii) if a physician is not physically
              present in the emergency department at the
              time an individual is transferred, a
              qualified medical person (as defined by the
              Secretary in regulations) has signed a
              certification described in clause (ii) after
              a physician . . ., in consultation with the
              person, has made the determination described
              in such clause, and subsequently
              countersigns the certification; and  
              (B) the transfer is an appropriate transfer
              (within the meaning of paragraph (2)) to
              that facility.
         A certification described in clause (ii) or (iii)
         of subparagraph (A) shall include a summary of
         the risks and benefits upon which the
         certification is based.

                      *        *        *

42 U.S.C.  1395dd (1994) (amended 1997).

</body>

</html>