758 So.2d 116 (2000)
Rickey G. SPRADLIN
v.
ACADIA-ST. LANDRY MEDICAL FOUNDATION.
No. 98-C-1977.
Supreme Court of Louisiana.
February 29, 2000.
*117 Peter T. Dazzio, Chris James LeBlanc, Watson, Blanche, Wilson & Posner, Baton Rouge, Counsel for Applicant.
Thomas Robert Shelton, Lafayette, Counsel for Respondent.
C. Scott Carter, Adrienne LaCour, Charles Owen Taylor, Metairie, Lynn Marie Terrebonne, LaPlace, Counsel for Carter & Taylor Law Firm (Amicus Curiae).
LEMMON, Justice.[*]
This is an action against a private hospital for survival and wrongful death damages. This matter is before the court on an exception of prematurity. The narrow issue is whether plaintiffs' claims under the federal Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, and under the Louisiana "anti-dumping"[1] statute, La.Rev.Stat. 40:2113.4-2113.6, when the claims are joined with medical malpractice claims, are subject to the pre-suit medical review panel requirement of the Louisiana Medical Malpractice Act, La.Rev.Stat. 40:1299.47 A.

Facts
On August 24, 1995, at 12:45 p.m., Rickey Spradlin took his wife to the emergency *118 room of defendant's private hospital with complaints of vomiting, upper back pain, fever and diarrhea. Mrs. Spradlin was examined by a doctor, two nurses and a respiratory therapist. Based on the results of laboratory tests and chest x-rays, the emergency room doctor diagnosed right upper lobe pneumonia and provisionally diagnosed right upper lobe cancer. After discussing his diagnosis with the couple, the doctor arranged for Mrs. Spradlin's transfer by ambulance to a public hospital about forty-five minutes away.[2]
Mrs. Spradlin suffered cardiac arrest in the public hospital that night and died early the next morning. The autopsy report states the probable cause of death as pseudomonas pneumonitis.
Plaintiffs, Mrs. Spradlin's survival and wrongful death beneficiaries, filed this action, naming the private hospital as the sole defendant and alleging patient "dumping" in violation of both EMTALA, 42 U.S.C. § 1395dd, and La.Rev.Stat. 40:2113.4.[3] Defendant lodged a dilatory exception of prematurity, claiming that it was a qualified health care provider and that the Louisiana Medical Malpractice Act required the entirety of plaintiffs' claims to be submitted first to a medical review panel. The district court overruled the exception without assigning reasons.
On defendant's application, the court of appeal exercised its supervisory jurisdiction and addressed the merits of the issue, initially agreeing with the district court. The court of appeal held that "[w]hile the Louisiana Medical Malpractice Act offers protections to medical providers whose liability arise from acts of negligence pertaining to the treatment of patients, EMTALA and La. R.S. 40:2113.4, exceptions to La. R.S. 40:1299.41, specifically govern instances in which damages result from the deprivation of emergency services by those ordinarily covered providers on the basis of an individual's lack of means." 97-845, p. 7 (La.App. 3d Cir.1/21/98), 711 So.2d 699, 702-03.
On rehearing, however, the court sustained defendant's exception of prematurity in part, holding that plaintiffs' action was premature to the extent they alleged conduct that constitutes a medical malpractice claim. The court stated:
On [original hearing], we determined that the plaintiff's claims for damages pursuant to the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. 1395dd and its Louisiana statutory equivalent, La. R.S. 40:2311[sic], were not subject to the procedural and substantive limitations imposed by the Louisiana Medical Malpractice Act.... After reviewing the petition, it appears that the plaintiff has alleged behavior on the part of the defendant which, if proven, would constitute malpractice and which occurred in the treatment of the decedent prior to the transfer and separately from the decision to transfer. Therefore, these claims appear to be unrelated to the EMTALA or "dumping" claim. Therefore, we conclude that the Louisiana Medical Malpractice Act applies to these claims and that these claims must be presented to a Medical Review Panel prior to suit.
*119 97-845, p. 1 (La.App. 3d Cir.6/24/98), 711 So.2d 699, 703 (on reh'g).
We granted defendant's application for certiorari, which urged that an EMTALA claim joined in the same action with a medical malpractice claim must also be submitted to a medical review panel. 98-1977 (La.11/6/98), 726 So.2d 914.

Prematurity
The dilatory exception of prematurity questions whether the cause of action has matured to the point where it is ripe for judicial determination. This exception is the proper procedural mechanism for a qualified health care provider to invoke when a medical malpractice plaintiff has failed to submit the claim for decision by a medical review panel before filing suit against the provider. In this type of case, the exception of prematurity neither challenges nor attempts to defeat any of the elements of the plaintiffs cause of action. Rather, the defendant asserts that the plaintiff has failed to take some preliminary step necessary to make the controversy ripe for judicial involvement. Thus a malpractice claim against a private qualified health care provider is subject to dismissal on a timely filed exception of prematurity if such claim has not first been screened by a pre-suit medical review panel. La.Rev.Stat. 40:1299.47 A. This pre-suit screening process acts to delay, not to defeat, a tort suit for malpractice. Frank L. Maraist and Thomas C. Galligan, Jr., Louisiana Tort Law § 21-3(f) (1996).

EMTALA and the Louisiana Medical Malpractice Act
Defendant argues that when a plaintiff joins a medical malpractice claim with alternative theories of liability, the entirety of the plaintiffs case is subject to the medical review panel requirement. This argument, of course, raises such issues as whether EMTALA incorporates procedural and substantive provisions of the applicable state law and whether EMTALA preempts any of those provisions.
The statutory definition of malpractice and the federal and state prohibition against patient "dumping" often involve similar conduct. The term "malpractice" has its roots (and relevance) in differentiating professionals from nonprofessionals for purposes of applying certain statutory limitations on tort liability. Health care providers are said to "practice" their profession, and their negligence in providing such professional services is called malpractice. Maraist & Galligan, supra at § 21-2.
On the other hand, hospitals, which are the only health care providers covered by EMTALA, are distinct legal entities that do not, in the traditional sense of the word, "practice" medicine. In the absence of statute, hospitals are subject to potential tort liability only vicariously on the basis of respondeat superior or independently on the basis of negligent hiring or training of the professional staff members employed by the hospital. Hospitals have frequently avoided even those forms of tort liability by asserting as a defense the independent contractor status of their professional staff members.
Indeed, this ability of hospitals to insulate themselves from tort liability, coupled with the general "dumping" problem, has been cited as one factor prompting Congress' creation of a private cause of action against hospitals in EMTALA. Wendy W. Bera, Comment, Preventing "Patient Dumping": The Supreme Court Turns Away the Sixth Circuit's Interpretation of EMTALA, 36 Hous. L.Rev. 615, 623 (1999).
In analyzing the relationship between the two "anti-dumping" statutes (EMTLA, which creates a separate cause of action for damages, and La.Rev.Stat. *120 40:2113.4[4]) and the Louisiana Medical Malpractice Act, we first discuss the acts individually in the order of their adoption.

The Louisiana Medical Malpractice Act
In 1975, the Louisiana Legislature, in response to a perceived medical malpractice crisis, enacted the Medical Malpractice Act.[5] Under the Act, a private health care provider, by taking specified steps, can become qualified for entitlement to certain limitations not available to other tort defendants. The primary limiting provisions available to private health care providers are the maximum amount of damages and the mandatory pre-suit review by a medical review panel, along with the special prescriptive and peremptive periods for malpractice actions provided by La.Rev. Stat. 9:5628.[6]
Since all of the limiting provisions applicable to qualified health care providers are "special legislation in derogation of the rights of tort victims," these provisions are all strictly construed. Sewell v. Doctors Hosp., 600 So.2d 577, 578 (La.1992). Moreover, these special provisions apply only to "malpractice," as defined in the Act, and any other liability of the health care provider is governed by general tort law.[7]

The Louisiana "Anti-Dumping" Statute
In 1980, the Louisiana Legislature enacted La.Rev.Stat. 40:2113.4-2113.6, establishing a statutory duty on the part of certain hospitals to provide emergency services to all persons residing in the territorial area, regardless of whether they are insured or able to pay. Section 2113.4 provides in part:
A. Any general hospital licensed under this Part, which is owned or operated, or both, by a hospital service district, which benefits from being financed by the sale of bonds that are exempt from taxation as provided by Louisiana law, or which receives any other type of financial assistance from the state of Louisiana *121 and which offers emergency room services to the public and is actually offering such services at the time, shall make its emergency services available to all persons residing in the territorial area of the hospital regardless of whether the person is covered by private, federal Medicare, or Medicaid, or other insurance. Each person shall receive these services free from discrimination based on race, religion, or national ancestry and from arbitrary, capricious, or unreasonable discrimination based on age, sex, or physical condition and economic status. However, in no event shall emergency treatment be denied to anyone on account of inability to pay. Any such hospital found to be in violation of this Section shall not receive any client referrals from the Department of Health and Human Resources. (emphasis added).
The purpose of this type of enactment, which had been adopted in several states and by Congress in the Hill-Burton Act, was to override the common law rule that hospitals have no duty to provide emergency treatment. Like the Hill-Burton Act and most other similar state enactments, but unlike EMTALA, the Louisiana "anti-dumping" statute contains no express private cause of action.[8]

EMTALA
In 1986, Congress enacted EMTALA in response to growing concern over the conduct of hospitals that were "dumping" patients by refusing to provide services to persons with emergency medical conditions who were uninsured or unable to pay for the services or by transferring such persons (generally to public hospitals or back home) before their emergency condition was stabilized. While the concern was narrow, Congress did not narrowly tailor the scope of persons protected by EMTALA. Congress did not limit EMTALA's scope to indigents or uninsureds; rather, Congress broadly defined the class of plaintiffs as any "individual" who presents himself or herself at a covered hospital's emergency department.
On the other hand, Congress narrowly defined the conduct required of hospitals when an individual requests examination or treatment at the emergency department. Under EMTALA, any individual who appears in the emergency department of a covered hospital and requests examination or treatment must be provided an "appropriate medical screening examination." In the event the hospital determines that the individual has an "emergency medical condition," the hospital is additionally required to provide further examination and treatment as may be necessary to stabilize the condition or to arrange for an appropriate transfer[9] to another medical facility. EMTALA thus statutorily sets up two distinct types of "dumping" claims: (1) failure to conduct an appropriate medical screening examination to determine the existence of an emergency medical condition, and (2) failure to stabilize the emergency condition or to provide an appropriate transfer.
The courts have construed EMTALA as creating a federal cause of action separate and distinct from, and not duplicative of, state malpractice causes of action. However, medical malpractice claims and "dumping" claims often overlap, as illustrated by the following hypothetical posed in Power v. Arlington Hosp. Ass'n, 42 F.3d 851, 859 (4th Cir.1994)(quoting district court's decision, 800 F.Supp. 1384, 1387 n. 6 (E.D.Va.1992)):
"Consider a situation in which a hospital adheres to a standard requiring tests A, *122 B, and C as part of an appropriate medical screening. In many instances, this standard will also be the malpractice standard of care. Thus, failure to perform test C, for example, would violate both EMTALA and the standard applicable in a malpractice claim. But if tests A, B, and C are performed and the doctor evaluating the results draws an incorrect conclusion, a violation of EMTALA may not be established, but medical negligence may be."
EMTALA not only establishes specific requirements of conduct for covered hospitals, but also provides special rules for enforcement of those requirements. Among those rules, two are particularly relevant to our analysis in the present case: (1) the two-year peremptive statute of limitations in EMTALA that is not subject to equitable tolling, 42 U.S.C. § 1395dd(d)(2)(C); and (2) the preemption provision, which preserves state and local laws except to the extent such laws "directly conflict" with EMTALA, 42 U.S.C. § 1395dd(f).[10] We discuss these EMTALA rules together.

Federal Preemption under EMTALA
Preemption issues are statutory construction issues. As Professor Tribe aptly articulates, "the question of whether federal law in fact preempts state action in any given case necessarily remains largely a matter of statutory construction" and cannot be reduced to any general formula. Laurence H. Tribe, American Constitutional Law § 6-25 (2d ed.1988).
The starting point is thus the statute itself. Indeed, EMTALA expressly addresses preemption, providing that "[t]he provisions of this section do not preempt any State or local law requirement of this section, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). Under this type of preemption, dual regulation of the same conduct is permitted as long as there is no conflict. As noted above, the state malpractice act and federal EMTALA requirements often regulate the same conduct.
Since EMTALA only preempts state law to the extent that state law "directly conflicts" with federal law, the issue becomes whether imposing a mandatory pre-suit medical review panel requirement "directly conflicts" with EMTALA. A state law may be preempted because of a direct or actual conflict with federal law in one of two ways:
First, there is preemption ... if it is impossible to comply with both state and federal law. If dual compliance is not "physically impossible" ... there is no "actual conflict." Second, state law "actually conflicts" with federal law "where state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."
2 Ronald D. Rotunda and John E. Nowak, Treatise on Constitutional Law § 12.4 (3d ed.1999)(quoting Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)). Hence, the test for determining whether a direct conflict exists is two-fold: "Such a [direct] conflict is found where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (emphasis added). 2 Norman J. Singer, Sutherland Statutory Construction § 36.08.50 (5th ed.1993); Deberry v. Sherman Hosp. Ass'n, 741 F.Supp. 1302, 1307 (N.D.Ill.1990).
Defendant contends that it is theoretically possible for a plaintiff in a given case *123 to comply with the Louisiana Medical Malpractice Act requirement of obtaining a decision from the medical review panel before filing suit and EMTALA's two-year limitation for filing suit. Defendant argues that when a plaintiff requests a medical review panel soon after the violation occurs and the one-year malpractice prescriptive period (rather than the three-year peremptive period) applies, compliance with both theoretically is possible. Defendant points out that the malpractice victim may file suit if the panel decision is not rendered within one year of the appointment of the panel chair. However, as defendant concedes, the period of time a medical review panel takes to render a decision is outside of the malpractice victim's control, and extensions of the time for the panel decision are common so that the timing of the decision frequently occurs outside the two-year period for filing an EMTALA claim.
Unlike the Louisiana Medical Malpractice Act which contains several provisions tolling prescription during the medical review panel proceeding, EMTALA contains a two-year limitation that is not subject to any tolling. Since the state tolling provisions cannot toll the running of EMTALA's two-year statute of limitations, the medical review panel requirement directly conflicts with EMTALA. Smith v. Richmond Memorial Hosp., 243 Va. 445, 416 S.E.2d 689, cert. denied, 506 U.S. 967, 113 S.Ct. 442, 121 L.Ed.2d 361 (1992). Because of this direct conflict, the panel requirement is preempted by federal law. Moreover, even if it is theoretically possible to comply with both the pre-suit medical review panel requirement and EMTALA's two-year limitation, engrafting such a procedural requirement onto an EMTALA claim would obstruct the accomplishment and execution of Congress' purpose and objectives.
Finally, "[a] state legislature or court cannot limit the rights that a plaintiff has in a federal claim that is pursued in a state court." 2 Norman J. Singer, Sutherland Statutory Construction § 36.08.50 (5th ed.1993). The court in Power v. Arlington Hosp. Ass'n, supra, explained:
As the [Virginia Supreme Court in] Smith observed, EMTALA "establishes a separate federal cause of action, cognizable in federal and state courts, independent of any additional or pendant state claims," with a two-year statute of limitation in § 1395dd(d)(2)(C) for filing claims. Id. Notwithstanding the fact that the Virginia Act tolls the statute of limitations during compliance with its procedural prerequisites, these state law tolling provisions cannot toll the running of EMTALA's two-year statute of limitations.... Because Virginia's procedural requirements are potentially in direct conflict with, and therefore inconsistent with EMTALA, we hold that they are not applicable to an EMTALA claim....
42 F.3d 851, 866 (quoting Smith v. Richmond Memorial Hosp., 416 S.E.2d at 695).
Permitting plaintiffs' medical malpractice and EMTALA claims to be lumped together and then applying the mandatory pre-suit panel review procedure to the claims as a whole would subvert the plain meaning and intent of 42 U.S.C. § 1395dd. Griffith v. Mt. Carmel Medical Ctr., 842 F.Supp. 1359, 1364 (D.Kan.1994)(declining to engraft comparative fault law onto EMTALA claim). Unlike medical review panels which are designed to weed out spurious medical malpractice claims and to encourage pre-trial settlement, EMTALA's private cause of action is designed to penalize hospitals and thereby discourage "dumping." This difference in purpose buttresses our holding that the procedural requirement of the Louisiana Medical Malpractice Act directly conflicts with EMTALA and is thus preempted.[11]

*124 Summary

In the present case, plaintiffs demanded damages under EMTALA based on defendant's alleged breach of its duty to properly stabilize or to appropriately transfer Mrs. Spradlin.[12] If plaintiffs prove a violation of the requirements of EMTALA (which does not distinguish between intentional and unintentional conduct), plaintiffs will be entitled to recover the appropriate damages.
Plaintiffs also alleged in this action conduct by defendant's employees that fell below the professional standard of care and would constitute medical malpractice. This claim must be submitted first to a medical review panel before plaintiffs can file the claim in district court.
Requiring separate suits based on related claims growing out of the same transaction or occurrence appears to be judicially inefficient and may produce inconsistent results. However, the court in the EMTALA action (which must be filed within two years) may consider whether it is appropriate under the particular facts and circumstances to grant a motion to stay that action, while urging expeditious action in the medical review panel proceeding. In any event, plaintiffs are entitled to recover damages on both claims, whether in one or two trials, if the different requirements of proof are met, despite the fact that the law requires exhaustion of an administrative remedy in one action that is not applicable to the other.

Decree
For these reasons, the judgment of the court of appeal is affirmed.
NOTES
[*] Kimball, J., not on panel. Rule IV, Part 2, § 3.
[1] Patient "dumping" by a private hospital generally includes the refusal to treat patients with emergency medical conditions who are uninsured and cannot pay for medical treatment or the transfer of such patients to a public hospital.
[2] Plaintiffs contend that the doctor suggested the transfer to a public hospital after learning that the couple had no medical insurance and were unable to pay for medical services. They further contend that the doctor failed to stabilize Mrs. Spradlin's condition before the transfer. Defendant claims the transfer was an appropriate one in that its hospital lacked the type of intensive care unit Mrs. Spradlin needed to give her the optimum chance of survival. This dispute, of course, goes to the merits of plaintiffs' claims, which are not before us.
[3] Contemporaneously, plaintiffs filed an almost identical petition to invoke a medical review panel to hear their medical malpractice claims for survival and wrongful death damages against both the hospital and the emergency room doctor. Only the first action solely against the hospital is before us.
[4] The issue of whether the Louisiana "anti-dumping" statute can be the basis for a cause of action in tort was expressly reserved for decision by this court in Fleming v. HCA Health Services of Louisiana, Inc., 96-1968 at p. 5(La.4/8/97), 691 So.2d 1216, 1219 n. 3 (noting that we "need not address the issue of whether a violation of La.Rev.Stat. 40:2113.6, which contains its own penalty provisions for a fine and suspension from the state medical assistance program, constitutes actionable fault in a tort action").
[5] The Legislature enacted two statutory schemes, one for private health care providers and one for state providers. Since defendant is a private provider, we will focus solely on the private health care statutes.
[6] Several other statutes have also been enacted to address the interplay between the requirement of a pre-trial medical review panel and the ordinary rules of prescription. As explained in Maraist & Galligan, supra at § 10-5:

Special prescription problems arise when one or more of the defendants is a qualified health care provider (QHCP). A suit against a QHCP is premature unless the claimant first obtains review by a Medical Review Panel. A request for a panel within the prescriptive period suspends the running of prescription until 90 days after the claimant is given notice of the panel's decision. The suspension also applies to claims against others who are solidary obligors with the QHCP against whom a medical review panel has been timely sought. If the medical malpractice defendant is not a QHCP, a safe harbor provision suspends prescription on the claim until after the claimant is notified that the health care provider is not a QHCP.
These authors further note a recent amendment providing that "the filing of a request for a Medical Review Panel suspends the running of prescription against all solidary obligors and all joint tortfeasors." Maraist & Galligan, supra at § 10-5(1999 Cumm. Supp.).
[7] Malpractice is defined in La.Rev.Stat. 40:1299.41 A(8) as follows:

"Malpractice" means any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient .... (emphasis added).
[8] We do not address whether there is a cause of action for damages under La. Civ.Code art. 2315, the fountainhead of tort liability, based on the violation of a statutory law designed to protect the injured person's interest.
[9] 42 U.S.C. § 1395dd prohibits the transfer of an individual whose emergency medical condition has not been stabilized except under certain specified conditions and provides specific regulations and restrictions regarding transfers.
[10] Because the present case is before the court on an exception of prematurity, we do not address whether EMTALA's provision that incorporates state law for recovery of damages includes state substantive provisions imposing limitations on the recovery of damages caused by medical malpractice. The statement by the court of appeal that EMTALA claims are not subject to the procedural and substantive limitations of the state malpractice act was dicta, since substantive limitations were not before the court.
[11] While this issue is res nova for this court, the federal and state courts that have addressed the issue have held that engrafting such a procedural limitation onto a federally created cause of action would result in a direct conflict and is thus preempted. See, e.g., Reid v. Indianapolis Osteopathic Medical Hosp., Inc., 709 F.Supp. 853 (S.D.Ind.1989); Smith v. Richmond Memorial Hosp., supra; Power v. Arlington Hosp. Ass'n, supra; HCA Health Services of Indiana, Inc. v. Gregory, 596 N.E.2d 974 (Ind.App. 1st Dist.1992). Factors supporting this conclusion by courts and commentators include: (1) EMTALA does not provide a requirement, expressly or impliedly, for a pre-trial medical review panel; (2) EMTALA's strict liability approach to stabilization claims makes a panel's finding of fault or negligence irrelevant and unnecessary; (3) EMTALA's two-year peremptive period of limitation could elapse before a panel decision is rendered; and (4) the purpose behind EMTALA's creation of a private cause of action would be defeated or undermined by engrafting such a procedural obstacle. Taken together, these factors establish an actual conflict between EMTALA and a pre-trial medical review panel requirement. Hence, the EMTALA preemptive provision precludes engrafting such a procedural requirement onto a plaintiff's federal cause of action pursued in state court.
[12] The facts recited in plaintiffs' petition do not state a claim under EMTALA based on failure to perform a medical screening examination (or based on disparate treatment in that examination, as opposed to pay patients). Whether there was any negligence in the diagnosis and treatment by the emergency room doctor prior to the decision to transfer is a matter to be addressed in the separate medical malpractice action.