823 So.2d 1002 (2002)
Robert Donald FLOOD, Jr.
v.
PENDLETON MEMORIAL METHODIST HOSPITAL.
No. 2002-CA-0440.
Court of Appeal of Louisiana, Fourth Circuit.
July 17, 2002.
*1004 Steven J. Rando, The Law Offices of Steven J. Rando, L.L.C., New Orleans, LA, Richard C. Trahant, Troy R. Keller, Metairie, LA, for Plaintiff/Appellant.
Richard E. Gruner, Jr., Nicole Duarte Martin, Lemle & Kelleher, L.L.P., New Orleans, LA, for Pendleton Memorial Methodist Hospital.
Grier J. Gregory, Law Offices of Robert E. Birtel, Metairie, LA, for Michael Morin, M.D.
Edward J. Rice, Jr., Arthur F. Hickham, Jr., Adams and Reese LLP, New Orleans, LA, for Janine Parker, M.D. and Ruben Vargas-Cuba, M.D.
Peter E. Sperling, Nairda T. Colon, Gary L. Hanes, Frilot, Partridge, Kohnke & Clements, L.C., New Orleans, LA, for Lowell Hurwitz, M.D.
(Court composed of Judge MIRIAM G. WALTZER, Judge JAMES F. McKAY III, and DENNIS R. BAGNERIS, Sr.).
Judge DENNIS R. BAGNERIS, SR.
Plaintiff, Mr. Robert Donald Flood, Jr. ("Mr.Flood"), appeals the trial court's judgment sustaining a dilatory exception of prematurity filed by the defendants, Pendleton Memorial Methodist Hospital, Dr. Janine Parker, Dr. Ruben Vargas-Cuba, Dr. Lowell Hurwitz, and Dr. Michael Morin (collectively referred to as the "Defendants"). This matter involved the alleged switching of Mr. Flood's nuclear bone scan with another patient. In finding that the Defendants' are qualified health care providers within the meaning of La. R.S. 40:1299.41, the trial court held that Mr. Flood's complaints should have been submitted to a medical review panel prior to filing the matter in the district court. Thus, the trial court found Mr. Flood's claims premature and dismissed his suit without prejudice. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
On May 22, 2001, Mr. Flood filed a petition against defendant Pendleton Memorial Methodist Hospital ("Pendleton"). Specifically, Mr. Flood's petition alleges that on January 28, 2000, he underwent a nuclear bone scan at Pendleton, and that an unidentified clerical or administrative employee of Pendleton switched his nuclear bone scan with the bone scan of another patient. Plaintiff alleges Pendleton was negligent in: (1) switching his bone scan with the bone scan of another patient; (2) handling and/or screening of diagnostics; failing to follow proper hospital procedure regarding the filing of diagnostics; (4) failing to read the correct name of the patient on the respective bone scan. Mr. Flood's petition alleges that he is entitled to damages because of Pendleton's negligent treatment of his bone scan.
On May 24, 2001, Mr. Flood supplemented and amended his original petition. Specifically, the first supplemental and amending petition alleges the following, in pertinent part:
XII.
Mr. Flood was being treated by Dr. Janine Parker, a pulmonologist, for emphysema and some other attendant lung problems. In December of 1999, a CT Scan ordered by Dr. Parker revealed a nodule in the left lung.

*1005 XIII.
Dr. Parker referred Mr. Flood to Dr. Ruben Vargas-Cuba, an oncologist, for further evaluation.
XIV.
Mr. Flood's initial visit to Dr. Vargas was on January 20, 2000. After this visit Dr. Vargas ordered additional diagnostic testing. Among those tests was a nuclear bone scan.
XV.
Dr. Lowell Hurwitz, a radiologist, performed the nuclear bone scan recommended by Dr. Vargas on Mr. Flood on January 28, 2000.
XVI.
Dr. Hurwitz prepared a report bearing Mr. Flood's name in which he diagnosed Mr. Flood with cancerous lesions on his bones, which covered much of the bone matter in his upper body.
XVII.
Based on this report, Dr. Vargas diagnosed Mr. Flood with "stage IV" cancer and informed him that his prognosis was terminal.
XVIII.
Dr. Vargas ordered Mr. Flood to undergo 5 aggressive courses of chemotherapy over the next five months, an order with which Mr. Flood complied.
XIX.
Five months later Dr. Vargas ordered another nuclear bone scan in order to re-evaluate Mr. Flood's condition.
XX.
On June 19, 2000, Dr. Michael Morin, a radiologist, performed a second nuclear bone scan on Mr. Flood. In the report of this bone scan, Dr. Morin noted that the lesions seen on Mr. Flood's January 28, 2000 bone scan appeared normal on the June 19, 2000 bone scan.
XXI.
Within days after receiving the results of this bone scan, Dr. Vargas asked Dr. Carl S. Merlin, a radiology oncologist on staff at Pendleton, to review Mr. Flood's case.
XXII.
Dr. Merlin immediately realized that Mr. Flood's 1/28/00 bone scan had been switched with the bone scan of another patient. Mr. Flood's real bone scan was normal, while the other patient actually had "stage IV" cancer.
XXIII.
Dr. Merlin also observed that a different name was on the January scan, and that every x-ray done since then apparently accepted the incorrect scans as Mr. Flood's bone scans.
XXIV.
Drs. Parker, Vargas, Hurwitz and Morin all either reviewed, or should have reviewed, Mr. Flood's bone scan at some point between January 28, 2000 and June 26, 2000, the day Mr. Flood was apprised of the mistake.
XXV.
The failures of Drs. Parker, Vargas, Hurwitz and Morin to notice that another patient's name was on the bone scan in Mr. Flood's folder/jacket constitute *1006 GROSS NEGLIGENCE on the part of each of these physicians.
XXVI.
Plaintiff specifically pleads that the GROSS NEGLIGENCE committed by each of these physicians is not covered by LSA-R.S. 40:1299.41, et seq. Consequently, plaintiff avers that the damage cap does not apply, and that these defendants cannot avail themselves of any protection provided by the medical malpractice act.
XXVII.
Plaintiff re-avers that the damages caused by the action of the additional defendants named herein are the same as the damages set forth in ... original Petition for Damages.
* * *
Again, on August 7, 2001, Mr. Flood supplemented and amended his petition for damages. The second supplemental and amending petition for damages alleged the following:
XXIX.
LSA-R.S. 40:1299.41 is unconstitutional in that it fails to exclude protection to medical providers based on acts of gross negligence, even though its State counterpart, LSA-R.S. 40:1299.39, does exclude acts of gross negligence from the protection of the act.
XXX.
LSA-R.S. 40:1299.39 (the State Act) excludes acts of gross negligence from the protection of the act.
XXXI.
LSA-R.S. 40:1299.41 (The Private Act) is silent as to the issue of acts of gross negligence.
XXXII.
Because LSA-R.S. 40:1299.41 is silent as to the issue of acts of gross negligence, whereas LSA-R.S. 40:1299.39 excludes acts of gross negligence, LSA-R.S. 40:1299.41 violates the Constitution of the State of Louisiana, Article 1, § 3.
XXXIII.
Unless LSA-R.S. 40:1299.41 is declared unconstitutional in part, Mr. Flood would be denied equal protection, equal access to the courts and equal remedies of law, as compared to an individual exactly similarly situated as him, who would bring this identical action under LSA-R.S. 40:1299.39
In response to these allegations, Defendants filed exceptions of prematurity, which sought to dismiss the trial court's action on the grounds that the Louisiana Medical Malpractice Act requires Mr. Flood's claim to be submitted to a medical review panel prior to the filing of a civil action. On November 26, 2001, the trial court maintained the Defendants' exceptions and dismissed Mr. Flood's lawsuit without prejudice as premature. In its Reasons for Judgment, the trial court stated, in pertinent part:
Plaintiff, Robert D. Flood, Jr., argues that the Private Medical Malpractice Act LSA RS 40:1299.41 (Private Act) is unconstitutional because it does not have a provision to exclude claims of "gross negligence", while the Public Medical Malpractice Act LSA RS 40:1299.39 (Public Act) does contain a provision to exclude claims of "gross negligence". Plaintiff further contends that Defendant's *1007 actions constitute "gross negligence", and therefore this claim does not have to be brought before a medical review panel prior to the filing of a lawsuit. The court finds that the Private Act is constitutional as written, and therefore will not address the issue as to whether Defendants actions constituted gross negligence.
The Private Act and the Public Act are different in many respects. The Public Act applies to state entities, someone acting in a professional capacity, and providing health care on behalf of the state, residents, interns or students being trained in a state facility, and health care providers who gratuitously treat patients eligible for state treatment. The gross negligence exception applies only to health care providers who gratuitously treat patients referred from a state facility. The "gross negligence" exception in the Public Act is not in the Private Act because the Private Act does not apply to health care providers who gratuitously treat patients. Thus, the gross negligence exception is not needed in the Private Act and it is not a violation of equal protection for it to apply in this situation.
On appeal, Mr. Flood argues that the trial court erred in its finding that the Private Medical Malpractice Act, La. R.S. 40:1299.41, is constitutional and does not violate the equal protection clause of the constitution. Mr. Flood further alleges that the trial court erred in failing to address the argument that any acts of clerical workers or technicians in mislabeling or misfiling his bone scan do not constitute health care.

DISCUSSION

Prematurity
The dilatory exception of prematurity is the proper procedural mechanism for a qualified health care provider to invoke when a medical malpractice plaintiff has failed to submit the claim for decision by a medical review panel before filing suit against the provider. Spradlin v. Acadia-St. Landry Medical Foundation, 98-1977 p. 4 (La.2/29/00), 758 So.2d 116, 119. See also La. R.S. 40:1299.47(A)(1). Accordingly, a claim against a private qualified health care provider is subject to dismissal on a timely filed exception of prematurity if such claim has not first been screened by a pre-suit medical review panel. Id.
ISSUE ONE: Whether Pendleton's employee's alleged negligence in misfiling and/or mislabeling Mr. Flood's diagnostic test constitutes "malpractice" within the scope of the Private Medical Malpractice Act, La. R.S. 40:1299.41.
Mr. Flood does not dispute that Defendants are all health care providers qualified under the Private Medical Malpractice Act; however, Mr. Flood argues that Pendleton is not covered because Pendleton's employee's act of misfiling his bone scan was a clerical act and does not constitute malpractice as defined under the Private Medical Malpractice Act. Plaintiff argues that the language of the Private Medical Malpractice Act and interpretive jurisprudence indicate the intent of the legislature is to exclude from its scope conduct unrelated to the promotion of a patient's health or the provider's exercise of professional expertise or skill. For the following reasons, we find that Mr. Flood's allegations that a Pendleton employee negligently misfiled his test results do in fact constitute "medical malpractice" as defined under the Private Medical Malpractice Act.
The Private Medical Malpractice Act, La. R.S. 40:1299.41, provides the following definitions relevant to this issue:
(1) "Health care provider" means a person, partnership, limited liability partnership, limited liability company, *1008 corporation, facility, or institution licensed by this state to provide health care or professional services as a physician, hospital, nursing home, community blood center, tissue bank, dentist, registered or licensed practical nurse or certified nurse assistant, ambulance service under circumstances in which the provisions of R.S. 40:1299.39 are not applicable, certified registered nurse anesthetist, nurse midwife, licensed midwife, pharmacist, optometrist, podiatrist, chiropractor, physical therapist, occupational therapist, psychologist, social worker, licensed professional counselor, or any nonprofit facility considered tax-exempt under Section 501(c)(3), Internal Revenue Code, pursuant to 26 U.S.C. 501(c)(3), for the diagnosis and treatment of cancer or cancer-related diseases, whether or not such a facility is required to be licensed by this state, or any professional corporation a health care provider is authorized to form under the provisions of Title 12 of the Louisiana Revised Statutes of 1950, or any partnership, limited liability partnership, limited liability company, or corporation whose business is conducted principally by health care providers, or an officer, employee, partner, member, shareholder, or agent thereof acting in the course and scope of his employment.
(2) "Physician" means a person with an unlimited license to practice medicine in this state.
(3) "Patient" means a natural person who receives or should have received health care from a licensed health care provider, under a contract, express or implied.
(4) "Hospital" means any hospital as defined in R.S. 40:2102; any "nursing home" or "home" as defined in R.S. 40:2009.2; or any physician's or dentist's offices or clinics containing facilities for the examination, diagnosis, treatment or care of human illnesses.
* * *
(8) "Malpractice" means any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from acts or omissions in the training or supervision of health care providers, or from defects in blood, tissue, transplants, drugs and medicines, or from defects in or failures of prosthetic devices, implanted in or used on or in the person of a patient.
(9) "Health care" means any act, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment or confinement.
The Louisiana Supreme Court has recently set forth a six-factor test for determining whether particular conduct by a health care provider constitutes "malpractice" under the Medical Malpractice Act.[1]Coleman v. Deno, XXXX-XXXX, pgs. 17-18 (La.1/25/02), 813 So.2d 303, 315-316. The Supreme Court utilized the following factors:

*1009 (1) whether the particular wrong is `treatment related' or caused by a dereliction of professional skill,
(2) whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached, and
(3) whether the pertinent act or omission involved assessment of the patient's condition.
(4) whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform,
(5) whether the injury would have occurred if the patient had not sought treatment, and
(6) whether the tort alleged was intentional.
Id.
Applying the Coleman factors to the facts of this case, we find that Mr. Flood's claim against Pendleton does constitute "malpractice" under the private Medical Malpractice Act. First, we agree with Pendleton that it's employee's alleged conduct in misfiling the results of Mr. Flood's diagnostic test is "treatment related" because the interpretation of the bone scan is a necessary step in Mr. Flood's cancer treatment program.
Second, we also agree with Pendleton that even if expert testimony is not required in this case because the conduct is regarded as "obvious negligence," this does not necessarily mean that the conduct is not malpractice. As stated by the Louisiana Supreme Court in Pfiffner v. Correa:
We [the Supreme Court] hold that expert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim. Though in most cases, because of the complex medical and factual issues involved, a plaintiff will likely fail to sustain his burden of proving his claim under LSA-R.S. 9:2794's requirements without medical experts, there are instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician's conduct as well as any expert can, or in which the defendant/physician testifies as to the standard of care and there is objective evidence, including the testimony of the defendant/physician, which demonstrates a breach thereof. Even so, the plaintiff must also demonstrate by a preponderance of the evidence a causal nexus between the defendant's fault and the injury alleged.
94-0924, 94-0963, 94-0992 pgs.9-10 (La. 1994), 643 So.2d 1228, 1234. Accordingly, expert evidence may not be needed because the alleged wrongful conduct in this case may be evaluated based on common knowledge.
Third, Pendleton's employee's conduct of misfiling Mr. Flood's test results undisputedly involves the assessment of Mr. Flood's condition. Moreover, we agree with Pendleton that "it is difficult to imagine conduct more inextricable intertwined with assessment of a patient's condition than recordation and handling of the patient's test results."
Fourth, we find that the alleged misconduct occurred within the context of a hospital-patient relationship and that Pendleton was within the scope of the activities it is licensed to perform. Initially, Mr. Flood was being treated for emphysema and other attendant lung problems. A CT Scan revealed a nodule in the left lung. Thereafter, Dr. Hurwitz ordered Mr. Flood's nuclear bone scan, the scan which was allegedly switched with the bone scan of another patient. Thus, Pendleton and Mr. Flood had an ongoing hospital-patient *1010 relationship throughout the period Mr. Flood received treatment for his lung problems.
The fifth factor, whether the injury would have occurred if the patient had not sought treatment, is quite obviously present. Mr. Flood's injury would not have occurred if he had not sought treatment at Pendleton because he would not have undergone the bone scan, the scan that was allegedly misfiled by Pendleton's employee.
The sixth factor is whether the tort alleged was intentional. However, because Mr. Flood does not even allege in his petition that Pendleton's employee's alleged acts were intentional, we see no reason to address this factor.
Additionally, we find a recent Third Circuit decision, Derouen v. State ex rel. Dept. of Health and Hospitals, although not binding on this Court, persuasive in determining whether or not Pendleton's employee's alleged act of misfiling Mr. Flood's bone scan constitutes "medical malpractice" under the Medical Malpractice Act. 98-1201 (La.App. 3 Cir. 2/3/99), 736 So.2d 890. In Derouen, the plaintiff was tested for Human Immunodeficiency Virus (HIV). Id. at 891. Thereafter, plaintiff was informed that she tested positive for HIV; however, a later test of the same blood sample was negative for HIV. Id. Plaintiff filed suit against the State whereby she alleged that "as a result of the State's mislabeling and/or mishandling" her HIV test, she was misinformed that she was HIV-positive when in fact her test indicated a negative result. Id. The Third Circuit found that pursuant to the State Medical Malpractice Act:
Claudette [plaintiff] was a `patient' who was receiving `health care' at the time the alleged acts of malpractice occurred. The drawing of the blood for HIV testing was an act which was performed by a state health care provider to a `patient' during the medical care of that patient. Further, Claudette [plaintiff] was receiving health care from a state health care provider, thus, she was a `patient.'
Id. at 892. The Third Circuit found that the trial court correctly sustained the State's exception of prematurity and that the plaintiffs allegations that her blood "... sample was mishandled and/or mislabeled by an employee of the State ...," does fall within the purview of the state Medical Malpractice Act. Id. at 892-893. Accordingly, the Third Circuit interpreted the definition of "malpractice" under the State Medical Malpractice Act to include a state employee's negligent act of mislabeling and/or mishandling an HIV test.
Applying the Coleman factors, along with recent jurisprudence, we find that Mr. Flood's allegations that Pendleton's employee negligently misfiled and/or mishandled his test results do in fact constitute "medical malpractice" within the Private Medical Malpractice Act.

ISSUE TWO: Whether the Medical Malpractice Act violates the Equal Protection Clause.
Mr. Flood argues that the Private Medical Malpractice Act, La. R.S. 40:1299.41, et seq, is unconstitutional (i.e. violates the equal protection clause)[2] because it, unlike *1011 the State Malpractice Act, La. R.S. 40:1299.39, et seq., does not exclude gross negligence from coverage under the Act. For the following reasons, we find no merit to Mr. Flood's argument
The interpretation of a statute, as in this case, is a question of law. Thus, this Court is to determine, through a de novo review, whether the trial court's ruling was legally correct or incorrect. Delacroix Corp. v. Perez, 1998-2447 p. 4 (La. App. 4 Cir. 11/8/00), 794 So.2d 862, 865, writ denied by, XXXX-XXXX (La.1/26/01), 782 So.2d 635. Further, statutes are presumed to be constitutional and the burden of proving that an act of the Legislature is unconstitutional is upon the party attacking the act. Soloco, Inc., v. Dupree, 97-1256, p. 2 (La.1/21/98), 707 So.2d 12, 14.
In order to properly address whether there is disparate treatment under the State Medical Malpractice Act versus the Private Medical Malpractice Act, a close reading of the State Medical Malpractice Act is required.
The State Medical Malpractice Act, La. R.S. 40:1299.39, provides the following definitions and general application, in pertinent part:
A. As used in this Part:
(1)(a) "State health care provider" or "person covered by this Part" means:
(i) The state or any of its departments, offices, agencies, boards, commissions, institutions, universities, facilities, hospitals, clinics, laboratories, health care units, ambulances, ambulance services, university health centers, and other state entities which may provide any kind of health care whatsoever, and the officers, officials, and employees thereof when acting within the course and scope of their duties in providing health care in connection with such state entity; or
(ii) A person acting in a professional capacity in providing health care services, by or on behalf of the state, including, but not limited to, a physician, psychologist, coroner, and assistant coroner who is a licensed physician when acting solely in accordance with the Mental Health Law as provided in R.S. 28:50, et seq., provided that the premium costs of such malpractice coverage shall be the responsibility of the coroner's office, dentist, registered nurse, licensed practical nurse, pharmacist, optometrist, podiatrist, physical therapist, laboratory or X-ray technician, social worker, hospital administrator, or licensed professional counselor, who is either:
(aa) Acting within the course and scope of his employment pursuant to a contract with the state, which contract specially names that health care provider and designates him to render such health care services, pursuant to a staff appointment to a state hospital or other state health care facility, or pursuant to an assignment to render such health care services for or on behalf of the state, without regard to where the services are performed, whether or not he is paid for such services; or
(bb) Performing voluntary professional services in a health care facility or institution for or on behalf of the state; or
(iii) A resident, intern, or student of, or any person who is otherwise qualified in, any discipline, including but not limited to, the disciplines listed in this Subsection *1012 when he is acting within the course and scope of the training or staff appointment in and under the supervision of a state hospital or other health care facility to which he is assigned as a part of his prescribed training in such discipline, without regard to where the services are performed.
(iv)(aa) A physician, surgeon, dentist, or hospital, and any employee of a physician, surgeon, dentist, or hospital not otherwise included in Item (i), (ii), or (iii) of this Subparagraph who gratuitously treats or provides services to any patient referred to him from a state hospital or other state facility without compensation or reimbursement from Medicaid or from any type of state or federal public assistance program, who gratuitously treats or provides services to any patient eligible for admission from a state hospital or other state facility without compensation or reimbursement from Medicaid or from any type of state or federal public assistance program, when the patient is certified by the state hospital or other state facility, to be eligible for admission to the state hospital or other state facility, only as it relates to services provided to that patient, or who gratuitously treats or provides services to a student in a public school health clinic without compensation or reimbursement from Medicaid or from any type of state or federal public assistance program.
(bb) Any provider referenced in this Item, in order to be covered by the provisions of this Part, shall signify in writing, by the end of the next business day after the patient presents himself for treatment, that all fees for professional medical or hospital health care services and all rights to reimbursement under Medicaid or any other federal or state public assistance or entitlement program are waived. For the purpose of this Item, a referred patient or the term "any patient referred" "from a state hospital or other state facility" shall mean a patient who presents himself for treatment to any health care provider enumerated in this Item after prior arrangements have been made between such a provider and a state hospital or other state facility where that patient has been receiving or has attempted to receive health care and medical services or in circumstances when no prior arrangements have been made or a patient who has attempted to reach or was in transit to such state hospital or facility to receive health care and medical services but was diverted from that intended destination by such hospital or facility because of lack of specialty medical services, treatment availability, or bed capacity, or any combination thereof.
(cc) However, no person or entity referenced in this Item shall be considered a "state health care provider" or "person covered by this Part" for any injury to or death of the patient resulting from any act or omission of gross negligence or any willful or wanton act or omission.

* * *
We agree with Mr. Flood that the State Act does exclude gross negligence from its coverage; however, the State Act only excludes gross negligence from its coverage under certain circumstances, none of which are present in this case. As the Defendants correctly point out, and as can be understood by reading the statute, the State Act applies to: (i) State entities; (ii) someone acting in a professional capacity and providing health care on behalf of the State; (iii) residents, interns or students being trained in a State facility; and (iv) health care providers "not otherwise included in Item (i), (ii) or (iii)" but who *1013 gratuitously treat or provide services to any patient eligible for State treatment or patients referred from a State facility. Item (iv) only provides coverage for non-qualified providers who gratuitously treat State patients. Further, the gross negligence exception is only to be applied for providers referenced in Item (iv). See La. R.S. 40:1299.39(A)(1)(a)(iv)(cc). Accordingly, we agree with Defendants that the gross negligence exception applies only to health care providers who are not otherwise qualified under the State Medical Malpractice Act, but who gratuitously treat patients either eligible for State treatment or who are referred from a State facility. See La. R.S. 40:1299.39(A)(1)(a)(iv)(aa) and (cc).
The Private Act, on the other hand, only applies to qualified health care providers who pay into the Patients' Compensation Fund. Thus, the Private Act would not apply to non-qualified health providers who gratuitously treat patients, and thus, the gross negligence exception is not needed. Accordingly, we agree with the trial court's finding that the gross negligence exception is not needed in the Private Act and that the Private Act is constitutional as written.
Further, we question whether Mr. Flood even has standing to raise the constitutional argument that the Private Medical Malpractice Act is unconstitutional when the State Medical Malpractice Act would not exclude acts of gross negligence under the same facts. Specifically, even if the Defendants in this case were State health care providers, Mr. Flood would still not be entitled to the gross negligence exception because the treatment would not have been rendered gratuitously by a non-qualified health care provider. Thus, because Mr. Flood fails to show that application of the Private Medical Malpractice Act treats him differently from other individuals similarly situated to him under the State Medical Malpractice Act, he should not be afforded the equal protection constitutional challenge to the Private Medical Malpractice Act, La. R.S. 40:1299.41.
In conclusion, we find that Defendants are qualified health care providers within the meaning of the Medical Malpractice Act, La. R.S. 40:1299.41 and that they are entitled to a medical review panel hearing prior to Mr. Flood bringing this suit. Accordingly, we affirm the trial court's judgment, which maintained the Exception of Prematurity and dismissed Mr. Flood's petition without prejudice.
AFFIRMED.
NOTES
[1] The first three factor's are set forth in Sewell v. Doctors Hospital., 600 So.2d 577, 579 n. 3 (La.1992).
[2] The Louisiana Constitution Article I, § 3 provides:

No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime.