917 So.2d 727 (2005)
Fred JACKSON, Individually and On Behalf of Charlie Edwards, Plaintiff-Appellee
v.
DeSOTO RETIREMENT AND REHABILITATION CENTER INC. and Its Unknown Insurer, Defendant-Appellant.
No. 40,482-CA.
Court of Appeal of Louisiana, Second Circuit.
December 14, 2005.
*728 David R. Sobel, Jeremy C. Cedars, Alexandria, for Appellant.
Murphy J. White, Mansfield, for Appellee.
Before BROWN, C.J., and WILLIAMS and PEATROSS, JJ.
WILLIAMS, J.
The defendant, DeSoto Retirement and Rehabilitation Center, Inc. ("DeSoto Retirement"), appeals a district court judgment overruling its dilatory exception of prematurity. At issue in this case is whether the plaintiff's allegation under the Nursing Home Residents' Bill of Rights, LSA-R.S. 40:2010.8, et seq. (the "NHRBR") that the nursing home's employees "caused [his brother] to fall/and or [sic] dropped him" must be submitted to a medical review panel pursuant to the provisions of the Louisiana Medical Malpractice Act, LSA-R.S. 40:1299.41, et seq. (the "MMA"). After reviewing the record and the applicable law, we reverse the district court's ruling and sustain the exception of prematurity.

FACTS
On December 9, 2004, the plaintiff, Fred Jackson, filed a petition for damages against DeSoto Retirement. In his petition, the plaintiff alleged that on August 14, 2004, his brother, Charlie Edwards, was a resident of DeSoto Retirement when DeSoto Retirement employees "caused Charlie Edwards to fall/and or [sic] dropped him which resulted in Charlie Edwards receiving a severe broken/fractured left hip which required closed reduction surgery." The petition further alleged that complications from this injury thereafter caused Mr. Edwards' death and that DeSoto Retirement negligently caused Mr. Edwards' injuries, damages and death.
On December 30, 2004, the plaintiff filed a first amended petition, stating that he "hereby amends and combines all of his *729 previous [p]etitions." The first amended petition omitted the allegation of negligence and substituted an allegation that the injuries to Mr. Edwards "were a direct result of the deprivation of his rights by [DeSoto Retirement], pursuant to R.S. 40:2010.6, R.S. 40:2010.7, R.S. 40:2010.8, and R.S. 40:2010.9 [NHRBR]."
In response, DeSoto Retirement filed dilatory exceptions of prematurity, vagueness and lack of procedural capacity. The exception of prematurity was based on the provisions of the MMA which require that allegations of malpractice first be reviewed by a medical review panel prior to the commencement of a lawsuit in district court. DeSoto Retirement contended that the plaintiff's cause of action arose "out of medical care and allegations of `malpractice' as defined by the [MMA]."
A hearing on the matter was held on March 23, 2005,[1] following which the district court granted the exceptions of vagueness and lack of procedural capacity, and permitted the plaintiff to amend his petition.[2] The exception of prematurity was denied. This appeal followed.[3]

DISCUSSION
LSA-C.C.P. art. 926 provides for the dilatory exception of prematurity. A suit is premature if it is brought before the right to enforce the claim has accrued. LSA-C.C.P. art. 423. Prematurity is determined by the facts existing at the time a suit is filed. Miller ex rel. Miller v. Nursing Homes Management, Inc., 38,198 (La.App.2d Cir.3/5/04), 867 So.2d 1000; Yokem v. Sisters of Charity of the Incarnate Word, 32,402 (La.App.2d Cir.6/16/99), 742 So.2d 906.
The MMA applies solely to claims arising from medical malpractice, which is defined in LSA-R.S. 40:1299.41(A)(8) as any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely....[4] Under LSA-R.S 40:1299.41(A)(7), a tort is defined as any breach of duty or any negligent act or omission proximately causing injury or damage to another and every health care provider is required, in rendering professional services or health care to a patient, to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, *730 and to use reasonable care and diligence, along with his best judgment, in the application of his skill.
Under the MMA, an action for malpractice against a qualified health care provider generally may not be commenced in a court of law before the complaint has been presented to a medical review panel and the panel has rendered its expert opinion on the merits of the complaint, unless the parties agree to waive this requirement. LSA-R.S. 40:1299.47.
The dilatory exception of prematurity is the proper procedural mechanism for a qualified health care provider to invoke when a medical malpractice plaintiff has failed to submit the claim to a medical review panel before filing suit against the provider. Rogers v. Hickory Manor Nursing & Rehabilitation, L.L.C., 39,626 (La.App.2d Cir.5/11/05), 902 So.2d 1150, citing Spradlin v. Acadia-St. Landry Medical Foundation, XXXX-XXXX (La.2/29/00), 758 So.2d 116, and Henry v. West Monroe Guest House, Inc., 39,442 (La.App.2d Cir.3/2/05), 895 So.2d 680. A claim against a private qualified health care provider is subject to dismissal on a timely filed exception of prematurity if such claim has not first been screened by a pre-suit medical review panel. Id.
In 1985, the legislature adopted the NHRBR for nursing home residents, enforceable by the Department of Health and Hospitals and by a private civil action. LSA-R.S. 40:2010.6-2010.9.[5] LSA-R.S. 40:2010.8(A) mandates nursing homes to "adopt and make public a statement of the rights and responsibilities of the residents" and treat such residents in accordance with the following rights:
(1) The right to civil and religious liberties, including but not limited to knowledge of available choices, the right to independent personal decision, and the right to encouragement and assistance from the staff of the facility in the fullest possible exercise of these civil and religious rights.
* * *
(7) The right to receive adequate and appropriate health care and protective and support services, including services consistent with the resident care plan, with established and recognized practice standards within the community, and with rules promulgated by the Department of Health and Hospitals.
LSA-R.S. 40:2010.8(D)(1) provides:
Any violations of the residents' rights set forth in R.S. 40:2010.6 et seq. shall constitute grounds for appropriate action by the Department of Health and Hospitals. Residents shall have a private right of action to enforce these rights, as set forth in R.S. 40:2010.9. The state courts shall have jurisdiction to enjoin a violation of residents' rights and to assess fines for violations not to exceed *731 one hundred dollars per individual violation.
LSA-R.S. 40:2010.9 provides:
A. Any resident who alleges that his rights, as specified in R.S. 40:2010.8, have been deprived or infringed upon may assert a cause of action for injunctive relief against any nursing home or health care facility responsible for the alleged violation. The action may be brought by the resident or his curator, including a curator ad hoc. The action may be brought in any court of competent jurisdiction to enforce such rights or to enjoin any deprivation or infringement on the rights of a resident. Any plaintiff who prevails in such action shall be entitled to recover reasonable attorney fees, and costs of the action, unless the court finds that the losing plaintiff has acted in bad faith with malicious purpose, and that there was an absence of a justiciable issue of either law or fact, in which case the court shall award the prevailing party his reasonable attorney fees.
B. The remedies provided in this Section shall not be construed to restrict other legal and administrative remedies available to a resident and to the Department of Health and Hospitals or other governmental agencies.
* * *
Emphasis added.
In Richard v. Louisiana Extended Care Centers, XXXX-XXXX (La.1/14/03), 835 So.2d 460, the Louisiana Supreme Court discussed the "varying views on whether a claim against a nursing home qualified under the MMA must be brought pursuant to the provisions of the MMA, or may be brought under the NHRBR." Richard at 464. The court stated:
We find that the NHRBR and the MMA can be harmonized.... [T]he NHRBR addresses twenty-two different rights of nursing home residents. Twenty-one of these rights could never be characterized as "malpractice." They include such varied rights as religious liberties, the right to be treated with dignity, the right to smoke and consume alcohol under certain circumstances, and the right to go to bed and rise in accordance with reasonable requests. Whereas the NHRBR encompasses nearly two dozen rights afforded residents in all nursing homes (not just the qualified ones), the MMA only relates to "malpractice" claims against qualified nursing homes. While there are many claims that a person can assert under the NHRBR that would not fall within the definition of medical malpractice and would, therefore, not be subject to review before a medical review panel, any claim of medical malpractice against a qualified health care provider is encompassed within the ambit of the MMA and must be reviewed by a medical review panel prior to suit.
Richard, 835 So.2d at 467.
Shortly thereafter, this court decided McLemore v. Westwood Manor Nursing & Rehabilitation, L.L.C., 37,450 (La.App.2d Cir.8/20/03), 852 So.2d 1170. In that case, the plaintiff filed a lawsuit against a nursing home, alleging that he was dropped by employees of the nursing home and placed in his bed without receiving any medical attention. The plaintiff alleged, inter alia, the nursing home was negligent in dropping him and failing to properly treat him thereafter. In response to an exception of prematurity filed by the defendants, the plaintiff contended that since he was not receiving medical care or treatment for any specific condition at the time of his injury, then his claims were not governed by the MMA. After discussing the supreme court's decision in Richard, *732 this court pointed out that the plaintiff's allegations included allegations of an unintentional tort with regard to the handling of the plaintiff, as well as failure to render appropriate care following the incident. We stated:
When reviewing the totality of the allegations of the plaintiff's petition in the case at bar, we conclude that the trial court did not err in sustaining the dilatory exception of prematurity. We recognize that the MMA limits the liability of healthcare providers in derogation of the general rights of tort victims, so that any ambiguities in the MMA should be strictly construed against coverage. Price [v. City of Bossier City, 96-2408 (La.5/20/97), 693 So.2d 1169]. Nevertheless, we conclude that the plaintiff's allegations of wrongdoing, especially concerning the failure to render services after the incident, are sufficiently "based on healthcare or professional services rendered or which should have been rendered by a healthcare provider to a patient" so as to require this matter to be presented to a medical review panel. In other words, we find that these allegations fit the first part of the Coleman test which requires a determination of whether the particular wrong is "treatment related" or caused by dereliction of professional skill. We also find that questions concerning the alleged insufficiency of treatment following the incident are questions which suggest that expert medical evidence is required to determine whether the appropriate standard of care was breached.
In Coleman v. Deno, 01-1517 (La.1/25/02), 813 So.2d 303, 315-316, the supreme court set forth a six-part test to determine whether a negligent act by a health care provider is covered under the MMA: (1) whether the particular wrong is "treatment related" or caused by a dereliction of professional skill; (2) whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached; (3) whether the pertinent act or omission involved assessment of the patient's condition; (4) whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform; (5) whether the injury would have occurred if the patient had not sought treatment; and (6) whether the tort alleged was intentional.
The plaintiff argues in brief, "The only remedy that plaintiff asked for was pursuant to the NHRBR and nothing else." However, it is clear that this action was not brought solely to enforce Mr. Edwards' rights under the NHRBR. Under the plain language of LSA-R.S. 40:2010.9, the plaintiff is limited to injunctive relief and possible attorney's fees for actions brought pursuant to the NHRBR. Yet, the plaintiff sought monetary damages on his own behalf for the following: (1) loss of companionship, love, solace and affection of his brother; (2) grief, mental anguish, and distress from the loss of his brother; (3) emotional distress from seeing his brother in near-death condition; (4) loss of consortium, service, and society, and (5) reasonable attorney's fees. The plaintiff itemized Mr. Edwards' damages as follows: (1) funeral and burial expenses; (2) hospital expenses; (3) medical expenses; (4) ambulance expenses; (5) physical pain, suffering and injury; (6) mental anguish and emotional distress; (7) present, past, and future medical expenses; (8) loss of enjoyment of life; and (9) loss of consortium of Fred Jackson.
Regardless of how the plaintiff has styled his action, it is readily apparent that it is an action in medical malpractice. As stated above, the MMA defines "malpractice" as "... any unintentional tort or any *733 breach of contract based on health care or professional services rendered or which should have been rendered by a health care provider to a patient...."
Our review of Mr. Edward's nursing home records reveals that he suffered from weakness and dementia, and he required "supervision and assistance with [activities of daily living] and personal hygiene." The records further indicated that Mr. Edwards was at risk for falls. According to the nurses' notes contained within the chart, Mr. Edwards was discovered lying on the floor by a nursing home employee on August 14, 2004. The note further indicated that Mr. Edwards had no apparent injuries at that time.[6] One entry for August 15, 2004 was as follows:
8/15/04 6:25A Called to res room per CNA. Res on floor in bathroom. Res states "I fell my hip hurts. I need to go to Dr." C/O pain to L hip area. 0 apparent injuries or skin impairments due to fall. Assessment (head to toe). Pedal pulses positive x 2, feet warm to touch. Called made to DRHER, sent out for evaluation of hip pain. Family notified. Waiting for call from DRHER about res cond.
Using the factors set forth in Coleman, supra, the totality of these circumstances tend to show that the degree of care that was or should have been provided for Mr. Edwards is a question whose answer requires expert medical knowledge. The medical records indicate that one of the reasons Mr. Edwards was in DeSoto Retirement was because he needed assistance with various daily activities, and the degree of assistance was a matter for DeSoto Retirement to determine per its expertise. Likewise, the opinion of experts will be required to determine if DeSoto Retirement breached the standard of care by, inter alia, allowing Mr. Edwards to get up the morning after his first fall without assistance and by failing to properly assess his condition after the first fall.

CONCLUSION
For the reasons set forth herein, the judgment of the trial court is reversed, and the exception of prematurity filed by DeSoto Retirement is hereby sustained. Costs of this appeal are assessed to plaintiff.
REVERSED.
NOTES
[1] During the hearing, DeSoto Retirement entered into evidence its certificate of enrollment with the Louisiana Patient's Compensation Fund as a qualified provider and Mr. Edwards' chart from the nursing home.
[2] Subsequently, the plaintiff filed a second amended petition to include an allegation that Mr. Edwards "left no children or descendants, nor left a surviving spouse, nor left a surviving mother or father." The second amended petition also revised the plaintiff's allegation that Mr. Edwards "had to receive medical treatment, where among other things, [he] suffered a severe broken/fractured left hip and due to the complications of his broken/fractured left hip herein died." The phrase "where among other things" was deleted.
[3] DeSoto Retirement originally sought a supervisory writ of review from that judgment, which was not considered by this court, as the writ application was incomplete. DeSoto Retirement then sought a devolutive appeal, which was granted.
[4] The provisions of LSA-R.S. 40:1299.41(A)(9) define "healthcare" as:

Any act, or treatment performed or furnished, or which should have been performed or furnished, by any healthcare provider for, to, or on behalf of a patient during the patient's medical care, treatment or confinement.
[5] The legislative intent for these provisions is stated in LSA-R.S. 40:2010.6:

The legislature finds that persons residing within nursing homes are isolated from the community and often lack the means to assert their rights as individual citizens. The legislature further recognizes the need for these persons to live within the least restrictive environment possible in order to retain their individuality and some personal freedom. It is therefore the intent of the legislature to preserve the dignity and personal integrity of residents of nursing homes through the recognition and declaration of rights safeguarding against encroachments upon nursing home residents' right to self-determination. It is further the intent that the provisions of R.S. 40:2010.6 through R.S. 40:2010.9 complement and not duplicate or substitute for other survey and inspection programs regarding nursing homes.
[6] We must point out that it is evident from the record that the nurses' notes dated August 14, 2004 were not documented until after the August 15th fall. The top of the page contained notes from August 15, 2004, documenting the fall and the subsequent events. Thereafter, a notation of "Late Entry" was entered, followed by documentation of the incident that occurred on August 14, 2004.